IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROUTE1 INC.,

    Plaintiff,

v.

AIRWATCH LLC,

    Defendant.

Civil Action No. 17-331-RGA

## MEMORANDUM OPINION

Dominick T. Gattuso, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; Michael J. Garvin (argued), Marcel C. Duhamel, Aaron M. Williams, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, OH; William H. Oldach III, VORYS, SATER, SEYMOUR AND PEASE LLP, Washington, DC.

    Attorneys for Plaintiff

Elena C. Norman, Anne Shea Gaza (argued), Samantha G. Wilson, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Cynthia D. Vreeland (argued), William F. Lee, Peter M. Dichiara, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA.

    Attorneys for Defendant

July 25, 2018


ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court is the issue of claim construction of multiple terms in U.S. Patent No. 7,814,216 ("the '216 patent"). The Court has considered the parties' joint claim construction brief. (D.I. 63). The Court heard oral argument on July 2, 2018. (D.I. 76 ("Tr.")).

## I. BACKGROUND

Plaintiff Route1 filed this patent infringement action against Defendant AirWatch on March 27, 2017. (D.I. 1).

The patent-in-suit "relates to use of a host computer via a remote computer, and more particularly, is directed to enabling peer-to-peer communication between the host computer and remote computer over a communication network." ('216 patent, 1:7–10).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13. "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III. PATENT-IN-SUIT

The parties dispute seven terms in claim 1 of the '216 patent. That claim reads as follows:

1. A method of enabling communication between a *host* and a *remote device* using a *controller*, comprising:

    *connecting* the *controller* to the *host*;

    *connecting* the *controller* to *the remote device*, the *host* and the *remote device* being in separate locations;

    *validating, at the controller, digital identity certificates received from each of the host and the remote device*, each identity certificate containing (i) the public half of an asymmetric key algorithm key pair, (ii) identity information, and (iii) a digital signature of the *issuing certificate authority*, thereby converting the *host* to a validated *host*, and converting the *remote device* to a validated *remote device*;

    receiving, at the *controller*, a selection of the *host* from the validated *remote device*;

    sending *parameters for the validated remote device* from the *controller* to the selected *host*;

    sending an instruction, from the *controller* to the selected *host*, to establish a *connection* to the *remote device*;

    *receiving, at the controller, notifications from the selected host and the validated remote device that a connection exists therebetween*; and

    after receiving notice of a connection between the selected *host* and the validated *remote device* refraining from involvement, at the *controller*, in transporting data between the selected *host* and the validated *remote device*, so that the selected *host* and the validated *remote device* subsequently communicate with each other without using any resource of the *controller*.

('216 patent, claim 1) (disputed terms italicized).

3

## IV. CONSTRUCTION OF DISPUTED TERMS

### 1. "controller"

    a. *Route1's proposed construction*: "computer (including hardware and software) configured to assist a host and remote device in setting up a communications connection"

    b. *AirWatch's proposed construction*: "computer (including hardware and software), separate from the host, that assists the process of establishing a direct communication channel between the host and the remote device"

    c. *Court's construction*: "computer (including hardware and software), different than the host, configured to assist a host and remote device in setting up a communications connection"

The parties' dispute regarding this term is twofold. First, they dispute whether the "controller" must be separate from the host. Second, they dispute whether the connection created between the host and remote device is a "direct communication channel."

As to the first dispute, the parties agree that the claims do not require the controller and host to be in different locations. (*See* D.I. 63 at 13–14, 19). They further agree, however, that the controller and host are "different entities." (*See* Tr. at 15:21–24). In light of the parties' agreement in that regard, I will construe this term to require only that the controller be "different than the host." I agree with Route1 that AirWatch's proposed language suggests the controller and host must be in separate locations.

As to the second dispute, for the reasons set forth below, I conclude no construction is necessary for the terms "connecting" and "connection." I decline to import the phrase "direct communication channel" into the claims.

I will construe this term to mean, "computer (including hardware and software), different than the host, configured to assist a host and remote device in setting up a communications connection."

4

2. **"host"**

   a. *Route1's proposed construction*: "computer (including hardware and software) having access to information or applications"

   b. *AirWatch's proposed construction*: "computer (including hardware and software) that hosts data or services"

   c. *Court's construction*: "computer (including hardware and software) that has information or applications"

The parties dispute whether, as Route1 argues, the "host" accesses information or applications, or whether, as AirWatch argues, it hosts information or applications.[1]

During colloquy at the hearing, there was some discussion of whether a "host" can be a so-called "pass-through" computer. (*See, e.g., id.* at 28:23–29:1). As I understand it, a "pass-through" computer does not contain any information, and instead acts as a sort of intermediary device. (*See id.* at 29:4–7). Route1 agreed at the hearing that "host" in the patent does not refer to such a "pass-through" device. (*Id.* at 47:11–12, 48:7).

In light of the parties' agreement on that point, and having reviewed the joint brief and intrinsic evidence cited by the parties, I think that "host" in the patent refers to a computer that hosts information or applications. I agree with Route1, however, that the redundancy (*i.e.*, a "host" is a computer that "hosts") in AirWatch's proposed construction would not be particularly helpful to the jury. Instead, I will construe this term to mean, "computer (including hardware and software) that has information or applications."

3. **"connecting" / "connection"**

   a. *Route1's proposed construction*: no construction necessary

   b. *AirWatch's proposed construction*: "establishing a direct communication channel with" / "direct communication channel"

---

[1] Although AirWatch's proposed construction states "data or services," it has indicated that it does not object to Route1's proposed language, "information or applications." (*See* Tr. at 34:8–12).

5

c. *Court's construction*: no construction necessary

The parties dispute whether these terms should be construed to require a "direct communication channel."

Route1 asserts, "The meanings of . . . 'connecting' and 'connection' are readily apparent to a fact finder." (D.I. 63 at 39). According to Route1, "AirWatch has failed to provide a legitimate basis" for importing the phrase "direct communication channel" into the claims. (*Id.*; *see also id.* at 39–46).

AirWatch counters that its proposal is supported by the specification and disclaimers made by the applicants during prosecution of the patent. (*Id.* at 31).

I agree with Route1.

As an initial matter, I am not persuaded by AirWatch's argument that, during prosecution, the applicants disclaimed everything but "direct communication channels." (*Id.* at 35). The various statements cited by AirWatch refer to, among other things, a lack of a "direct connection" between the host and remote device in certain prior art references. (*See, e.g.*, D.I. 64-1, p. 148). Each of those statements seems to be tied at least in part to the eighth and final limitation in claim 1 of the patent, however, which requires the controller to "refrain[] from involvement" in subsequent communications between the host and remote device once it receives notifications of a connection therebetween. Thus, it is not clear to me that the applicants sought to distinguish their invention from systems in the prior art on the basis that those systems do not describe "direct communication channels" between the various components. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach . . . the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable."). Rather, the applicants seemed to be focused on the controller's

6

involvement in subsequent communications between the remote and host. To the extent any of the statements cited by AirWatch can be read to relate solely to the seventh step of claim 1, that is, the step relating to the controller's receiving connection notifications, I do not find those statements to be clear and unmistakable disclaimers of anything but "direct communication channels."

Nor am I persuaded by AirWatch's arguments regarding the patent specification. AirWatch cites various portions of the specification describing direct communications between the various components of the claimed method. (*See* D.I. 63 at 32–34). It is generally improper, however, to import limitations from the specification into the claims. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). Further, I do not think, as AirWatch contends, that the patent's references to "peer-to-peer" communications make clear the term "connection" throughout the patent refers to a "direct communication channel." As support for that contention, AirWatch relies solely upon the unsupported statements of its expert. Such evidence is hardly ever persuasive, and it is not persuasive in this case.

In any event, I do not think the jury will have any problem understanding the words "connecting" or "connection." Accordingly, I conclude no construction is necessary for those terms.

### 4. "validating" / "validating, at the controller, digital identity certificates received from each of the host and remote device"

a. *Route1's proposed construction*: "comparing a presented credential with a stored credential to determine if they match"

b. *AirWatch's proposed construction*: no construction necessary, alternatively, if construed: "the controller confirms that digital identity certificates received from each of the host and remote device are valid evidence of the host's and remote device's identities"

7

c. *Court's construction*: "confirming, at the controller, that digital identity certificates received from each of the host and remote devices are valid evidence of the host's and remote device's identities"

At the hearing, Route1 proposed an alternative construction to which AirWatch agreed. (*See* Tr. at 74:13–75:19). Accordingly, I adopt that construction. This term is construed to mean, "confirming, at the controller, that digital identity certificates received from each of the host and remote devices are valid evidence of the host's and remote device's identities."

### 5. "issuing certificate authority"

   a. *Route1's proposed construction*: "party that issues certificates"

   b. *AirWatch's proposed construction*: "trusted third party that issues certificates"

   c. *Court's construction*: "party that issues certificates"

The parties dispute whether, as Route1 argues, an "issuing certificate authority" is any "party that issues certificates," or whether, as AirWatch argues, it is a "trusted third party that issues certificates."

Route1 maintains that AirWatch's proposal improperly imports a limitation from the specification into the claims. (D.I. 63 at 58).

AirWatch argues that the patent expressly defines "certificate authority" as a "trusted third party." (*Id.* at 60, 65–66).

I am not persuaded by AirWatch's lexicography argument.

As support for that argument, AirWatch focuses primarily on the following sentence in the specification: "Trusted third parties—known as Certificate Authorities (CA)—maintain and make the 'certificates' accessible . . . ." ('216 patent, 3:17–18). I am not convinced that sentence amounts to lexicography. First, the purported lexicography does not follow the usual conventions for lexicography. *See, e.g., Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511

8

F.3d 1132, 1136 (Fed. Cir. 2007) (discussing indicators of lexicography such as use of quotation marks and use of the word "is" (citation omitted)). There is no lexicography section in the specification. *Cf. Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) (noting that statement in specification that a term is "defined below" "provides a strong signal of lexicography"). "Certificate Authorities" is not set off by quotation marks. *See Sinorgchem*, 511 F.3d at 1136 (noting that use of quotation marks around a term is "often a strong indication that what follows is a definition"). "Certificate Authorities" is not the subject of the sentence. I recognize that lexicography can occur without any of these indications of lexicography. Nevertheless, the lack of these indicators makes the argument that this is lexicography less compelling. Second, the plain reading of the sentence does not compel the conclusion that "trusted third parties" are the only example of "certificate authorities." Third, unlike anywhere else in the patent, the initial letters of "certificate authorities" are capitalized, which, in my opinion, suggests the patentees did not intend for that sentence to define "certificate authority" as the term appears throughout the patent. The abbreviation "CA" is never used other than in this sentence. In any event, the standard for finding lexicography is "exacting." *GE Lighting Sols., LLC v. Agilight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). I do think that standard has been met in this case.

Nor am I persuaded that the statements of AirWatch's expert and a definition from Newton's Telecom Dictionary (*see* D.I. 63 at 62–63) compel a particular construction in this case.

Accordingly, I decline to adopt AirWatch's proposed construction. This term is construed to mean, "party that issues certificates."

9

### 6. "parameters for the validated remote device"

   a. *Route1's proposed construction*: "identifying information, such as a remote device's ID or IP address"

   b. *AirWatch's proposed construction*: no construction necessary, alternatively, if construed: "identifying information including the remote device's ID and IP address"

   c. *Court's construction*: "two or more pieces of identifying information, such as a remote device's ID, IP address, and a token identifying the connection"

At the hearing, I proposed a construction for this term to which Route1 and AirWatch agreed. (*See* Tr. at 90:23–92:5). Accordingly, I will adopt that construction. This term is construed to mean, "two or more pieces of identifying information, such as a remote device's ID, IP address, and a token identifying the connection."

### 7. "receiving, at the controller, notifications from the selected host and the validated remote device that a connection exists therebetween"

   a. *Route1's proposed construction*: no construction necessary

   b. *AirWatch's proposed construction*: "the controller receives notices sent by each of the selected host and the validated remote, when they begin communicating with each other, that a direct communication channel[2] exists therebetween"

   c. *Court's construction*: no construction necessary

Route1 argues this term need not be construed. (D.I. 63 at 72). Contrary to AirWatch's contentions, asserts Route1, the disputed language "contains no temporal relationship between when the notices are sent and when the host and remote commence communicating." (*Id.* at 75).

At the hearing, AirWatch maintained that, as to this term, "the most important issue" relates to disclaimer. (Tr. at 111:1–2). More specifically, AirWatch argues that, in responding

---

[2] AirWatch makes the same arguments in support of its proposed "direct communication channel" language as it does above with respect to the "connecting" and "connection" terms. For the same reasons stated above in regard to those terms, I decline to adopt AirWatch's proposed language requiring a "direct communication channel."

10

to AirWatch's petition for *inter partes* review ("IPR"), Route1 distinguished prior art reference Flowers such that it limited the scope of the '216 patent claims to require that the notifications be sent when the host and remote "begin communicating with each other." (*See id.* at 111:3–113:22; D.I. 63 at 74).

I am not persuaded by AirWatch's disclaimer argument.

As an initial matter, the Federal Circuit has held that "statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017). Of course, any such statements must "constitute a clear and unmistakable surrender of claim scope." *Id.*

Here, in responding to AirWatch's IPR petition and distinguishing its invention from the Flowers reference, Route1 stated:

> The connection notices of Claim 1 cannot be read on Flowers' log-in and log-out messages. Flowers' log-in messages are a ***prerequisite*** to using the services of broker computer C, whereas the Claim 1 connection notices are a ***consequence*** of using the services of broker computer C. Flowers' log-out messages occur when peer devices are ***finished*** communicating with each other and no longer wish to be available to other peer devices, whereas the Claim 1 connection notices occur when devices ***begin*** communicating with each other.

(D.I. 64-1, p. 328).

In my opinion, this passage suggests that Route1 sought generally to distinguish the connection notices of the '216 patent from the log-in and log-out messages of Flowers. As I understand it, Flowers teaches the use of log-in and log-out messages that are either too early or too late, as compared to the connection notices in the '216 patent. In other words, unlike the Flowers messages, the connection notices of the '216 patent are neither a prerequisite to using the services of the controller nor do they occur when the host and remote are finished

11

communicating. In that context, I think Route1's statements can be reasonably understood to distinguish the timing of the '216 patent notices from the timing of the Flowers messages, without limiting the notices to the point where the devices begin communicating with each other. In other words, when read in context, I do not think Route1's statement that the notices occur "when devices begin communicating with each other" constitutes an "unequivocal[] and unambiguous[] disavow[al] [of] [] meaning." *See Aylus*, 856 F.3d at 1359.

Nor am I persuaded by AirWatch's arguments in regard to the claim language and the patent specification.

To the extent the patent describes certain embodiments in which connection notices are sent when the host and remote begin communicating, limiting the claims to cover those embodiments would be improper. *See Liebel-Flarsheim Co.*, 358 F.3d at 904.

Further, I do not think the plain reading of the claims suggests the notices can only be sent when the devices begin communicating. The only communication referenced in the body of the claim is in the final limitation, which describes the controller "refraining from involvement . . . . so that the selected host and the validated remote device subsequently communicate with each other." ('216 patent, 10:24–30). While the remote and host perform a "handshake" just prior to the sending and receiving of the connection notices (*see id.* at Fig. 3A), AirWatch cites no intrinsic evidence suggesting the patentees meant for this "handshake" to be part of the claimed "communication." In any event, I do not think it would be proper to limit the disputed term in the way AirWatch proposes.

Because I do not think the jury will have any problem understanding this term, I conclude no construction is necessary.

## V. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion suitable for submission to the jury.