IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ROUTE1 INC., | |
| *Plaintiff/Counterclaim Defendant,* | C.A. No. 17-331-KAJ |
| | **REDACTED - PUBLIC VERSION** |
| *v.* | |
| AIRWATCH LLC, | |
| *Defendant/Counterclaim Plaintiff.* | |

**AIRWATCH LLC'S COMBINED BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND NO WRITTEN DESCRIPTION, AND ITS *DAUBERT* MOTION REGARDING DAMAGES**

Dated: April 18, 2019
         Redacted Version: April 25, 2019
OF COUNSEL:

Richard S. J. Hung
Christopher J. Wiener
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
rhung@mofo.com
cwiener@mofo.com

Bita Rahebi
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
brahebi@mofo.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Elena C. Norman (No. 4780)
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
enorman@ycst.com
agaza@ycst.com
swilson@ycst.com

*Attorneys for AirWatch LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

TABLE OF ABBREVIATIONS .................................................................................. vi

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

II.     NATURE AND STAGE OF THE PROCEEDINGS & STATEMENT  OF THE
        FACTS ............................................................................................................. 2

        A.     Route1 ................................................................................................... 2

        B.     The '216 Patent .................................................................................... 3

        C.     AirWatch ............................................................................................... 6

III.    ARGUMENT .................................................................................................... 8

        A.     Route1 Has Not Shown that Anyone Has Ever Performed the Accused
               Steps. .................................................................................................... 8

               1.     Route1 provides no specific instances where all required
                      components have been used together. .......................................... 9

               2.     The accused products do not necessarily infringe because the
                      identified components are optional. ........................................... 10

               3.     Route1 circumstantial evidence is insufficient to prove that
                      AirWatch's products necessarily infringe. ................................ 11

               4.     AirWatch's internal testing cannot show direct infringement. ....... 14

               5.     Even if the circumstantial evidence showed a single infringing use,
                      Route1's failure of proof is fatal to its damages case. ............... 14

        B.     AirWatch's Products Do Not Satisfy Multiple Claim Limitations. ...... 15

               1.     AirWatch's products do not instruct a host "to establish a
                      connection with [a] remote device." .......................................... 16

                      a.     The host must establish the connection, not the remote ............. 16

                      b.     AirWatch's "host" does not establish the connection .................. 17

               2.     AirWatch's products do not receive "a selection of the host." ........ 18

               3.     AirWatch's products lack a "host." ............................................. 19

                      a.     No individual server is a host ....................................................... 20

                      b.     A host cannot be a pass-through computer .................................. 20

               4.     AirWatch does not send "notifications from the selected host and
                      the validated remote device that a connection exists." ............... 22

               5.     Prosecution history estoppel bars Route1's equivalents theories. ........ 24

        C.     Route1's Patent Is Invalid. ................................................................ 25

i

# TABLE OF CONTENTS

**Page**

D. Route1's Damages Expert Testimony Should Be Excluded.................................. 28

    1. Mr. Haas's failure to apportion warrants exclusion.................................... 29

        a. Mr. Haas fails to apportion his royalty base ............................... 29

        b. Mr. Haas fails to apportion his royalty rate ............................... 31

    2. Mr. Haas fails to tie his royalty calculations to actual uses of the claimed method.................................................................................... 33

    3. Mr. Haas's comparable license analysis should be excluded. ................. 33

        a. Mr. Haas does not show his licenses are technologically comparable ............................................................................... 34

        b. Mr. Haas does not show his licenses or the ▮▮▮▮ ▮▮▮▮ are economically comparable........................................ 35

IV. CONCLUSION.............................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.*,
501 F.3d 1307 (Fed. Cir. 2007)...........................................................................8, 10

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc)................................................................25

*Becton Dickinson and Co. v. Tyco Healthcare Grp.*,
616 F. 3d 1249 (Fed. Cir. 2010)..............................................................................22

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
No. 15-152-RGA, 2018 U.S. Dist. LEXIS 167104 (D. Del. Sept. 28, 2018)...............28, 32

*Bos. Sci. Corp. v. Johnson & Johnson*,
647 F.3d 1353 (Fed. Cir. 2011)...............................................................................25

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
541 F.3d 1115 (Fed. Cir. 2008)...............................................................................25

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir 2015).................................................................................28

*D Three Enters. LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018)...............................................................................25

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)............................................................................................28, 33

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys. Inc.*,
347 F.3d 1314 (Fed. Cir. 2003)...............................................................................24

*Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*,
272 F.3d 1365 (Fed. Cir. 2001)...............................................................................25

*Devex Corp. v. General Motors Corp.*,
667 F.2d 347 (3d Cir. 1981), *aff'd*, 461 U.S. 648 (1983) ......................................15

*E-Pass Techs., Inc. v. 3Com Corp.*,
473 F.3d 1213 (Fed. Cir. 2007).......................................................................9, 11, 12

*Eagle Harbor Holdings, LLC v. Ford Motor Co.*,
No. C11-5503 BHS, 2015 WL 12670404 (W.D. Wash. Mar. 9, 2015)...................33

*Ericsson v. D-Link Sys.*,
   773 F.3d 1201 (Fed. Cir. 2014)..............................................................28, 29, 30, 31

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp.*,
   LLC, 879 F.3d 1332 (Fed. Cir. 2018)................................................................28

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)...........................................................................................24

*Finjan, Inc. v. Blue Coat Sys.*,
   879 F.3d 1299 (Fed. Cir. 2018)........................................................................29

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
   734 F.3d 1352 (Fed. Cir. 2013)........................................................................24

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (1997).........................................................................................27

*Lucent Techs., Inc. v. Gateway, Inc.*
   543 F.3d 710 (Fed. Cir. 2008)....................................................................12, 13

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)..........................................................9, 14, 15, 33

*M2M Sols. LLC v. Enfora, Inc.*,
   167 F. Supp. 3d 665 (D. Del. 2016)........................................................33, 34, 35, 36

*Mirror Worlds, LLC v. Apple Inc.*,
   692 F.3d 1351 (Fed. Cir. 2012)....................................................................9, 12

*Parallel Networks Licensing LLC v. IBM*,
   No. 13-2072 (KAJ), 2017 U.S. Dist. LEXIS 58394 (D. Del. Apr. 17, 2017).........................35

*Pioneer Magnetics, Inc. v. Micro Linear Corp.*,
   330 F.3d 1352 (Fed. Cir. 2003)........................................................................25

*Purdue Pharma L.P. v. Faulding Inc.*,
   230 F.3d 1320 (Fed. Cir. 2000)........................................................................26

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
   647 F. Supp. 2d 323 (D. Del. 2009)..................................................................11

*TechSearch, L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002)..........................................................................8

*Univ. Of Rochester v. G.D. Searle & Co.*,
   358 F.3d 916 (Fed. Cir. 2004)..........................................................................25

*VirnetX, Inc. v. Cisco, Sy*s.,
   767 F.3d 1308 (Fed. Cir. 2014)...................................................................28, 30

*Wahpeton Canvas Co. v. Frontier, Inc.,*
   870 F.2d 1546 (Fed. Cir. 1989).........................................................................4

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,*
   520 U.S. 17 (1997)...........................................................................................24

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.,*
   609 F.3d 1308 (Fed. Cir. 2010).......................................................................35

*Zimmer Surgical, Inc. v. Stryker Corp.,*
   No. 16-679-RGA, 2019 U.S. Dist. LEXIS (D. Del. Mar. 9, 2019) ..................34, 37

**Statutes**

35 U.S.C. § 112(a) ...........................................................................................25

35 U.S.C. § 271(a) .......................................................................................9, 14

**Other Authorities**

Fed. R. Evid. 702 ............................................................................................28

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '216 patent | U.S. Patent No. 7,814,216 |
| ACC | AirWatch Cloud Connector |
| EIS | Enterprise Integration Service |
| EMM | Enterprise Mobility Management |
| MDM | Mobile Device Management |
| MEM | Mobile E-mail Management |
| SEG | Secure E-mail Gateway |
| SSP | Self-Service Portal |
| SSPPU | Smallest Saleable Patent Practicing Unit |
| Snoeren Opening | January 7, 2019 Opening Expert Report (invalidity) Ex. A to the Declaration of Alex Snoeren[1] |
| Snoeren Rebuttal | February 7, 2019 Rebuttal Expert Report (non-infringement) Ex. B to the Declaration of Alex Snoeren |
| Snoeren Reply | February 21, 2019 Reply Expert Report (invalidity) Ex. C to the Declaration of Alex Snoeren |
| Davis Rebuttal | February 7, 2019 Rebuttal Expert Report (damages) Ex. A to the Declaration of Julie Davis |
| Hitt Rebuttal | February 7, 2019 Rebuttal Expert Report (apportionment) Ex. A to the Declaration of Lorin Hitt |

---

[1] Highlighting has been added to Dr. Snoeren, Ms. Davis, and Mr. Hitt's expert reports to indicate the portions relevant to AirWatch's motions.

## I.       INTRODUCTION AND SUMMARY OF ARGUMENT

Route1 obtained a narrow patent on specific technology.  It began as a company providing "MobiKEYs"—essentially, USB "dongles" that users plugged into their personal computers.  Using "reverse-connection" technology, these dongles allowed users to view and interact with their work desktop computers remotely.  Fundamental to Route1's approach was its assumption that personal computers could not be "trusted" to store sensitive corporate data.  After users finished their sessions and detached their dongles, nothing remained behind.

Route1's patented technology struggled in the market.  With its limited sales faltering, ███████████████████████████████ and sued AirWatch for patent infringement.

AirWatch's industry-leading solutions differ completely from Route1's reverse connection technology.  Information technology ("IT") professionals worldwide use AirWatch's software to make personal devices (*e.g.*, smartphones) trusted.  Once installed, AirWatch's software constantly monitors devices to ensure that they remain secure.  If so, AirWatch's software allows the devices to contact company servers and retain copies of sensitive documents.

These contrasting approaches come into sharp relief when mapping Route1's patented methods onto AirWatch's products.  It simply cannot be done.  Not only does AirWatch's software fail to satisfy over a half dozen limitations of the patented methods, Route1 has no evidence that anyone has configured the various AirWatch software components in an infringing manner.  Worse, Route1's stretching of its patent beyond its remote-desktop origins exposes it to invalidity challenges.  Any one of these defects warrants judgment in AirWatch's favor.

Beyond these technological deficiencies, Route1's damages claim is equally deficient.  To justify its $20+ million damages demand, Route1's damages expert (i) neglects to apportion the royalty base, (ii) every sale in his royalty base involves the use of a claimed method, and (iii) applies an exorbitant ██████ by cherry-picking two licenses from a licensing database and

relying on a ███████████ of AirWatch's entire product portfolio.  Its failure to apportion

violates black-letter Federal Circuit law, and the two licenses and ███████████ are plainly

non-comparable.  Route1's damages opinions therefore should be excluded.

## II.   NATURE AND STAGE OF THE PROCEEDINGS & STATEMENT OF THE FACTS

### A.   Route1

Route1 is a Toronto-based software company founded in 2002.  (Compl. (D.I. 1) ¶ 6.)

According to its Complaint, Route1 "develop[s] secure data protection technologies and user

authentication for government and businesses."  (*Id.*)

Route1's technology relies on three selling points: (i) hardware security; (ii) a "reverse-

connection" for traversing firewalls; and (iii) the absence of data left behind on the user's device.

(Ex. 1.)[2] ████████████████████████████████████████

(Ex. 2 at 8-13; Ex. 3 at 1-2.)  During prosecution of U.S. Patent No. 7,814,216 ("the '216

patent," Ex. 4), Route1 described its MobiKEY product as follows:

> MobiKey is a chip that can be plugged in to a USB port of a computer,
> and then cooperates with the computer it is plugged in to, to serve as a
> remote as described and claimed in the instant application.

(Ex. 5 at RT_00000116; *see also* Ex. 6 at RT_00020262; Ex. 2 at 8-13.)

Route1's technology addressed the problem that users ordinarily cannot access their

desktop computers remotely if those computers are behind a corporate "firewall."  Firewalls

"restrict information flow between [the] Internet [] and [the] local area network []."  (Ex. 4 at

2:56-57.)  This includes "block[ing] unsolicited messages to [a] host computer," such as an

"access request from a remote computer."  (Ex. 5 at RT_00000335.)

To allow users to access their desktop computers, Route1 placed a "MobiNET" server in

---

[2] References to "Ex." are to exhibits to the Declaration of Christopher J. Wiener.

front of the firewall.  After users plugged the MobiKEY into their personal computer, the

MobiKEY would contact the MobiNET server to request access to "host assets" (*e.g.*, their

desktop computers).  The MobiNET server then would instruct the hosts to establish secure

connections (*i.e.*, "█████████████████████") with the users' personal computers.

(Ex. 2 at 10.)  Once those connections were established, the users could interact with their

desktop computers through a restricted graphical user interface.  Because users could not

download or store company data on their personal devices through this interface, the

MobiKEY/MobiNET system purported to provide a high degree of security.  (*See id.* at 6, 16.)

Route1's products have not been commercially successful, and the company has

struggled of late.  Three of its products that practice the patent—MobiLINK, MobiENCRYPT,

and DerivID—have had ████████████ (Ex. 3 at 2.)  While Route1 historically has targeted

its products to government agencies, those sales have been limited.  (*Id.* at 3; Ex. 7 (Busseri Dep.

V.1) at 49:9-50:15.)  In March 2017 (the month that it filed this lawsuit), Route1 announced that

a "cornerstone" customer had declined to renew its license, resulting in a ███████████

drop in revenues.  (*Id.* at 184:12-185:10; Ex. 8 at 2; Ex. 9 at 3.)  Route1's shares currently trade

for 6.5¢ (CAD), and it reported 2017 revenues of $6 million (CAD).  (Ex. 10; Ex. 9 at 3.)

In early 2017, Route1 ████████████████████████████

████████████████ (Ex. 11 at 8.)  Route1 then sued AirWatch for allegedly infringing the

'216 patent in March 28, 2017.  (Ex. 12 at 13.)

## B.     The '216 Patent

The patent that Route1 asserted, the '216 patent, is entitled, "System & Method for

Accessing Host Computer via Remote Computer."  The patent purports to cover the reverse

connection technology underlying Route1's products.  The patent has a single independent

method claim and ten dependent claims.  Independent claim 1 recites:

**[1a (preamble)]** A method of enabling communication between a host and a remote device using a controller, comprising:

**[1b]** connecting the controller to the host;

**[1c]** connecting the controller to the remote device, the host and the remote device being in separate locations;

**[1d]** validating, at the controller, digital identity certificates received from each of the host and the remote device, each identity certificate containing (i) the public half of an asymmetric key algorithm key pair, (ii) identity information, and (iii) a digital signature of the issuing certificate authority, thereby converting the host to a validated host, and converting the remote device to a validated remote device;

**[1e]** receiving, at the controller, a selection of the host from the validated remote device;

**[1f]** sending parameters for the validated remote device from the controller to the selected host;

**[1g]** sending an instruction, from the controller to the selected host, to establish a connection to the remote device;

**[1h]** receiving, at the controller, notifications from the selected host and the validated remote device that a connection exists therebetween; and

**[1i]** after receiving notice of a connection between the selected host and the validated remote device refraining from involvement, at the controller, in transporting data between the selected host and the validated remote device, so that the selected host and the validated remote device subsequently communicate with each other without using any resource of the controller.

(Ex. 4.)  As claim 1 is the only independent claim, AirWatch cannot infringe any other claim unless it infringes claim 1.  *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

As Figure 1C (below) illustrates, the claimed invention allows users of "remote devices" (*e.g.*, PDAs or laptop computers) to connect to "hosts" (*e.g.*, desktop computers) using a "controller" (step [1c]).  The controller validates these remote devices and hosts using their "digital identity certificates" (step [1d]).  To establish a connection between the remote and host,

4

the user selects a host and sends that selection to the controller (step [1e]).  In response, the

controller coordinates a "peer-to-peer" (*i.e.*, direct) connection between the remote and host.

(Ex. 4, Abstract.)  Specifically, the controller sends the remote device's "parameters" (*e.g.*, ID

and IP address) to the selected host (step [1f]).  (*Id.* at 6:45-50, 61-67.)



Fig. 1C

After the host establishes this connection, the user employs standard remote viewing

technology (*e.g.*, Virtual Network Computing, or "VNC") on the remote device to interact with

the host.  (*Id.* at 7:21-36.)  The remote device and host exchange data directly without using the

controller's resources (step [1i]).  (*Id.* at 3:35-39, 2:63-64.)  Although not involved in the data

communications, the controller may "track[] usage," send "status request messages" and

"standby messages," and be involved with "keep[ing] alive" or "disconnect[ing]" the host and

remote device.  (*Id.* at 7:37-9:9, Fig. 3C.)

The alleged novelty of the claimed invention arises from its use of a "reverse connection"

(*i.e.*, the host's establishment of the connection with the remote device, instead of the opposite).

According to Route1, this avoids problems arising from corporate firewalls, which block

connection requests from computers outside of the firewall.  (*See* Ex. 5 at RT_00000335.)

Prosecution of the '216 patent was protracted, involving six Office Actions and two

appeals.  (*Id.* at RT_00000069 - RT_00000074 (10/19/2006 Non-Final Rejection), RT_00000094

- RT_00000101 (4/19/2007 Final Rejection), RT_00000137 - RT_00000144 (10/5/2007 Non-

Final Rejection), RT_00000178 - RT_00000187 (8/7/2008 Final Rejection).)  Route1's many

amendments to the claims included its addition of steps [1d] ("validating . . . digital identity

certificates . . ."), [1f] ("sending parameters . . ."), [1g] ("sending an instruction . . ."), and [1h] ("receiving . . . notifications . . ."); *see also* Snoeren Opening ¶ 83.)

Route1 ultimately obtained allowance only by emphasizing the invention's "reverse connection" aspect.  During its second appeal from the Examiner's Final Rejection, Route1 distinguished the prior art Kiwimagi reference as "teach[ing] that the remote takes the initiative to establish a connection to the host."  (Ex. 5 at RT_00000344.)  According to Route1, Kiwimagi did not satisfy claim 1's requirement that the controller "send[] an instruction . . . to the selected host to establish a connection with the remote device."  The Examiner then allowed the claims.

Fourteen Route1 products allegedly "practice each claim of the '216 Patent in conjunction with Route1's MobiNET . . . universal identity management and service delivery platform."  (Ex. 3 at 1-2.)  This includes MobiKEY, which Route1 demonstrated to the U.S. Patent Office during prosecution.  (Ex. 5 at RT_00116; *see also* Ex. 6 at 4; Ex. 2 at 8-13.)

### C.   AirWatch

Founded in Atlanta in 2003, AirWatch is a pioneer and market leader in Enterprise Mobility Management ("EMM").  (Ex. 14 at AIR00026034 to -35.)  Using its solutions, IT personnel can deploy, support, and audit access to corporate resources from users' personal devices.  (*Id.* at AIR00026039.)  Route1 and AirWatch do not compete.  (Ex. 7 (Busseri Dep. V.1) at 53:11-20.)  Unlike Route1, AirWatch's technology lets a user's device retain corporate data.  (*Id.* at 68:8-69:7; Ex. 15 at AIR00968; Ex. 14 at AIR0026046 to -47, -52.)

When a user joins a new company, IT personnel can install AirWatch software on the user's personal smartphone.  The software periodically monitors the smartphone's status to confirm that it remains trusted (*e.g.*, has not been "jailbroken" or "rooted").  If so, the device can continue to access, download, and store data (*e.g.*, corporate e-mail).  (Ex. 15 at AIR00000968; Ex. 14 at AIR00026046 to -47, -52.)  If the user departs the company, the same IT personnel can

6

instruct AirWatch's software to "wipe" the company's data off the user's smartphone, but leave the user's personal data intact.  (Ex. 16 at AIR00002081; *see also* Snoeren Rebuttal ¶ 88.)

AirWatch's EMM solution requires certain components, such as Devices Services and the Console.  These components allow IT personnel to enroll, assess, and manage users' personal devices that have AirWatch software installed.

Other EMM components are optional.  For example, companies may use AirWatch's Enterprise Integration Service ("EIS") or its successor, the AirWatch Cloud Connector ("ACC"), to relay information to internal corporate servers (*e.g.*, an e-mail server).  Companies also may install AirWatch's Secure E-Mail Gateway ("SEG") software in front of a company's e-mail server to provide additional security and monitoring capabilities.  (*See id*. ¶¶ 97-113.)

Companies and users may choose which specific AirWatch EMM features and components to use or install, depending on their specific needs.  (Ex. 18 (Robertson Dep.) at 42:22-43:5, 44:24-46:9, 92:2-16; Hitt Rebuttal ¶¶ 82-84.)  For example, companies may use AirWatch's PowerShell Integration feature to control access to an e-mail server running Microsoft Exchange.  (Snoeren Rebuttal ¶ 92.)  Users also can use AirWatch's Self-Service Portal, a web-based interface, to manage their personal devices installed with AirWatch's EMM software.  (*Id*. ¶ 106.)  Customers also may choose which *non*-AirWatch products (*e.g.*, a Microsoft Exchange e-mail server) to use with AirWatch's products.

Route1 alleges that the use of a particular combination of AirWatch EMM components— specifically, "the components performing the functions of a controller that enables communication between remote devices and corporate resources, such as a corporate email server"—infringes the '216 patent claims.  (Ex. 22 (Akl Opening) ¶ 44.)  Per Route1, the following components of AirWatch's solutions map onto the following limitations from claim 1:

| Claim 1 Limitation | Alleged Component in AirWatch's Software |
|---|---|
| "remote device" | user's personal device |
| "controller" | Devices Services + Console |
| "host" | Enterprise Integration Service/AirWatch Cloud Connector + Secure E-mail Gateway + Microsoft Exchange |
| "parameters" | PowerShell integration |
| "selecting a host" | Self-Service Portal |

These alleged "remote device," "controller," and "host" components are highlighted in the general system diagram below:[3]



(Ex. 23 at 6 (annotations added).)

## III.    ARGUMENT

### A.    Route1 Has Not Shown that Anyone Has Ever Performed the Accused Steps.

Summary judgment is "appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002). "[T]o prove direct infringement, a patentee must either [A] point to specific instances of direct infringement or [B] show that the accused device necessarily infringes the patent in suit." *ACCO*

---

[3] The Secure E-mail Gateway (not depicted) is optional.  Route1 has alleged that it forms part of the alleged "host," if used.

*Brands, Inc. v. ABA Locks Mfr. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

Because claim 1 of the '216 patent is a method claim, Route1 must show that someone has performed every step of the claimed method in the U.S. for AirWatch to infringe.  *See Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1359 (Fed. Cir. 2012) (affirming judgment due to lack of evidence that all steps performed); 35 U.S.C. § 271(a) (infringement must be "within the United States").  AirWatch's "sales of its software alone cannot" show infringement. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) ("*Lucent I*").

### 1.    Route1 provides no specific instances where all required components have been used together.

Route1's infringement theory depends on operations carried out by a specific combination of components.  These are:

- [1] Enterprise Integration Service/AirWatch Cloud Connector and [2] Microsoft Exchange for actions of the "host";

- [3] Self-Service Portal for "receiving . . . a selection a host" (step [1e]); and

- [4] PowerShell Integration for "sending parameters" (step [1f]).

(*See* Ex. 22 (Akl Opening) ¶¶ 88(c), 94, 108-109, 120, 123, 129.)

But neither Route1 nor its expert identifies evidence that anyone, anywhere has ever used this specific combination to practice claim 1's specific steps.  Route1 only speculates that these four components have been used together in the required manner in a specific AirWatch deployment.  Its technical expert, Dr. Akl, admits that he is unaware of evidence directly showing that AirWatch or any of its customers has performed all of the allegedly infringing steps together.  (Ex. 24 (Akl Dep.) at 136:3-138-23, 143:9-144:21.)  Nor has Dr. Akl ever performed the allegedly infringing steps or seen them performed.  (*Id.* at 32:13-23, 35:21-36:4.)

This absence of evidence warrants judgment in AirWatch's favor.  *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (affirming summary judgment where

plaintiff failed to show that anyone performed the patented steps).

> **2.      The accused products do not necessarily infringe because the identified components are optional.**

Having failed to provide any "specific instances of direct infringement," Route1 is

required to "show that the accused device necessarily infringes the patent in suit."  *ACCO*,

501 F.3d at 1313.  But Route1 cannot show AirWatch's products necessarily infringe, as the four

components required for its infringement theory are optional:

- Enterprise Integration Service/AirWatch Cloud Connector:  EIS/ACC is optional and turned off by default.  (*See, e.g.*, Snoeren Rebuttal ¶ 220.)

- Microsoft Exchange:  AirWatch's software can be used with e-mail servers (*e.g.*, SMTP, Blackberry, or Google) besides Microsoft's.  (*Id.* ¶¶ 153, 203, 225.)

- Self-Service Portal ("SSP"):  Use of the SSP is voluntary and can be accessed from any computer, not just a "validated remote device."  (*Id.* ¶¶ 140, 222-223.)

- PowerShell Integration:  This component, used only with Microsoft Exchange, is optional and disabled by default.  (*Id.* ¶¶ 92-95.)

Route1's expert, Dr. Akl, identifies no evidence demonstrating that use of any of these

components is mandatory—much less all of them together.  (Ex. 24 (Akl Dep.) at 136:3-138:23,

143:9-144:21).)  Nor has Dr. Akl ever performed the allegedly infringing steps or seen them

performed.  (*Id.* at 32:13-23, 35:21-36:4.)

Not only does Dr. Akl fail to demonstrate that all four components must be used together

by AirWatch or its customers, he also does not show that the components must be operated

together in the accused manner.  For example, as Dr. Akl concedes, the step of "validating [the]

digital identity certificate received from . . . the remote device" (step [1d]) must precede the step

of "receiving . . . a selection of the host from the validated remote device" (step [1e]).  (Ex. 25

(Akl Rebuttal) ¶¶ 176-177.)  But in his infringement analysis, Dr. Akl fails to present any

evidence that the PowerShell Integration operation relied on in step [1d] is carried out before

receiving the alleged selection of the host using the Self-Service Portal in step [1e].   (*Compare*
Ex. 22 (Akl Opening) ¶¶ 101-116 (discuss step [1d]) *with id*. ¶¶ 117-121 (discussing step [1e]).)

Route1's failure to identify a specific instance of the allegedly infringing use, or that
AirWatch's products necessarily perform the allegedly infringing steps, warrants judgment in
AirWatch's favor.   This is particularly true in view of the non-infringing uses for these
components discussed below.  *See SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 647 F. Supp. 2d 323,
337 (D. Del. 2009) (where non-infringing uses exist, patentee "obligated to identify specific
instances of direct infringement involving [the accused] products.") (citing *ACCO*, 501 F.3d at
1313).   Summary judgment therefore is appropriate.  *See E-Pass*, 473 F.3d at 1222 (Fed. Cir.
2007) (affirming summary judgment where no evidence that steps performed in required order).

### 3.   Route1's circumstantial evidence is insufficient to prove that AirWatch's products necessarily infringe.

Route1 points only to circumstantial evidence (*e.g.*, AirWatch's product literature,
Dr. Akl's source code review, and alleged internal testing) to try to prove that someone,
sometime, somewhere might have used the identified components to perform the steps of claim 1
in the United States.   But mere speculation that infringement is possible cannot show that
AirWatch's products "necessarily infringe."   Furthermore, it is undisputed that AirWatch
products have non-infringing uses.

**Product manuals.**  *E-Pass* confirms that Route1's attempt to string together isolated
descriptions of the accused components from multiple product manuals is insufficient.   The
claims there, as here, required that certain steps be performed in order.  *See* 473 F.3d at 1222.
And the patentee, too, pointed to manuals to show that the steps were performed.  *See id.*

On appeal, the Federal Circuit affirmed the district court's grant of summary judgment.
The appellate court explained that the product manuals, "at best," demonstrated "that the . . .

11

defendants taught their customers each step of the claimed method in isolation." *Id.* But it was "too speculative a leap to conclude [from the manuals] that any customer actually performed the claimed method," as they "[n]owhere [taught] all of the steps of the claimed method together." *Id.* at 1222; *see also Mirror Worlds*, 692 F.3d at 1360 (Fed. Cir. 2012) ("When manuals only teach 'customers each step of the claimed method in isolation,' but not 'all the steps of the claimed method together,' the manuals alone cannot support infringement.") (quoting *E-Pass*).

Here, Route1 cannot point to a single document showing that use of the accused AirWatch products necessarily requires all four identified components, much less their use in an infringing manner. For example, neither Route1 nor its experts cite any document showing that any user has used the Self-Service Portal from something corresponding to a "validated remote device," much less with the other three components and in the required order. (*See, e.g.*, Ex. 22 (Akl Opening) ¶ 120 (citing only release notes from a 2010 version of AirWatch that generically refer to Exchange ActiveSync credentials); Ex. 26 (release notes cited by Dr. Akl).) Similarly, nothing in Dr. Akl's cited documents ties the "selection of the host" in step [1e] to "sending parameters" in step [1f].

**Source code.** Dr. Akl's source code analysis also cannot show use of all accused components together, much less in the required order. Dr. Akl analyzes less than 0.15% of AirWatch's source code for its EMM products. (Snoeren Rebuttal ¶ 143.) While Dr. Akl's analysis describes what some of the source code might do if it is ever executed, he never explains or shows that any of the source code's functionality ever actually executes.

The Federal Circuit's decision in *Lucent Techs., Inc. v. Gateway, Inc.* 543 F.3d 710, 723 (Fed. Cir. 2008) ("*Lucent II*"), is instructive. There, the patentee similarly argued that its expert's review of defendant's source code proved practice of a method claim, even though he

had never seen it performed.  Affirming the trial court's grant of judgment as a matter of law, the Federal Circuit agreed that the expert's source code review "established only uncertainty and speculation as to whether the [patented method] had run even once." *Id.* at 723.

The Federal Circuit explained that identifying where the functionality corresponding to particular method steps existed in the source code was not enough, as the expert failed to demonstrate that anyone had ever invoked these steps. *Id.*  If performing the claimed method "was so common and routine" as the plaintiff claimed, "then certainly [it] could have produced evidence of at least one instance . . . ." *Id.*  But it did not—and neither has Route1.

Route1's and its expert's reliance on source code is misplaced for the same reasons as in *Lucent II*.  Although Route1 inspected AirWatch's source code for over forty hours, its technical expert Dr. Akl never once used the accused products or talked to anyone that had used them. (Ex. 24 (Akl Dep.) at 32:13-23, 35:21-36:4.)  Dr. Akl further admits that components of the accused configuration (*e.g.*, PowerShell Integration) are optional.  (*Id*. at 117:3-122:19.)

Route1 and Dr. Akl also failed to cite any evidence that anyone has ever executed any functionality in the cited source code in the manner that claim 1 requires.  For example, step [1f] requires that the parameters be sent to the "selected host."  This necessarily requires that step [1e], which refers to the "selection of the host," has already occurred.  But neither Route1 nor Dr. Akl has ever shown that anyone has (i) used the PowerShell Integration functionality allegedly associated with step [1f] after (ii) using the Self-Service Portal functionality alleged associated with step [1e] to "select[] . . . [a] host from the validated remote device."  Nor does Dr. Akl show that this necessarily occurs.

**Non-infringing uses.**  Route1 accuses only a specific set of components from the broad set of products that AirWatch provides.  (Snoeren Rebuttal ¶¶ 76-121.)  According to Dr. Akl,

these specific components must perform a specific set of operations.  (*Id.* ¶¶ 136, 139-40.)

As noted above, however, several of the components required for Dr. Akl's infringement analysis are optional.  And as Dr. Snoeren has explained, even the accused components can be used without performing the accused operations.  (*Id.* ¶¶ 92, 136, 139-40, 153, 159, 207, 220-25, 228, Exhibit C ¶¶ 9, 13.)  Having limited his analysis to the allegedly infringing components and assumed their infringing operation, Dr. Akl does not dispute Dr. Snoeren's analysis.  (Ex. 24 (Akl Dep.) at 51:15-52:15, 92:13-93:16, 117:3-122:19, 134:25-135:8.)

### 4.    AirWatch's internal testing cannot show direct infringement.

Route1 also cannot rely on AirWatch's internal testing of its software to show infringement.  Although Route1 relies on three documents to demonstrate AirWatch's testing of its own software (Ex. 22 (Akl Opening) ¶ 71), none of these documents shows that AirWatch has tested the accused components together and in the manner accused of infringement.  (*See, e.g.*, Ex. 24 (Akl Dep.) at 130:24-131:16, 132:7-21, 135:9-11 (admitting inability to identify where documents show testing of accused SSP functionality).)  And because AirWatch develops its software in both the U.S. and India, proof that AirWatch has practiced the claimed methods without evidence of where that testing occurred still would be insufficient.  (*See* 35 U.S.C. § 271(a); Ex. 43; *see also* Ex. 24 (Akl Dep.) at 126:13-130:17 (testifying that software testing typically occurs where it is developed, that he is unaware where AirWatch testing occurs, and that he is not sure if all steps are tested).)

### 5.    Even if the circumstantial evidence showed a single infringing use, Route1's failure of proof is fatal to its damages case.

Route1's inadequate evidence of infringement also is fatal to its damages claim.  Route1 "ha[s] the burden to prove that the extent to which the infringing method has been used supports the lump-sum damages award."  *Lucent I*, 580 F.3d at 1334-35.  Here, Route1 seeks damages on

every U.S. sale of the accused products, regardless of whether those products were ever used in an infringing manner. (Ex. 27 (Haas Dep.) at 96:10-97:11, 99:19-23, 159:25-160:24.) Stated otherwise, Route1's lump sum royalty calculations assume that all of AirWatch's U.S. sales of the accused software components infringe. (Ex. 22 (Akl Opening) ¶ 83.)

But because Route1 cannot show specific instances of infringement or that combining the various optional components necessarily infringes, Route1 has no evidentiary support for that assumption. Even if circumstantial evidence shows that "at least one person performed the patented method one time in the United States sometime during the relevant period," "all the jury ha[s] [i]s speculation" beyond that. *Lucent I*, 580 F.3d at 1334-35. "No evidence describes how many . . . users ha[ve] ever performed the patented method or how many times." *Id.*

This gulf between (i) Route1's assumption that all software sales infringe and (ii) the reality that its infringement case depends on four optional components defeats not just its liability case, but also its damages claim. Accordingly, summary judgment of no damages is warranted. *See Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981), *aff'd*, 461 U.S. 648 (1983) (affirming award of no damages due to lack of evidentiary basis).

### B.   AirWatch's Products Do Not Satisfy Multiple Claim Limitations.

In response to AirWatch's multiple letters detailing deficiencies with Route1's infringement case, Route1 modified its infringement theories repeatedly. But its latest theory (the third iteration during this litigation) remains flawed. Route1 still cannot show that:

(i)   AirWatch's software sends "an instruction, from the controller to the selected host, to establish a connection to the remote device";

(ii)   AirWatch users select a "host" from a remote device;

(iii)   The accused configuration involves a non-pass-through "host";

(iv)   The alleged "host" and "remote device" in the accused configuration send "notifications . . . that a connection exists"; and

15

(v)     Route1 is entitled to any scope of equivalents for the "digital identity certificate," "parameters," and "notifications" steps.[4]

### 1.    AirWatch's products do not instruct a host "to establish a connection with [a] remote device."

#### a.    The host must establish the connection, not the remote

Step [1g] requires the step of "sending an instruction, from the controller to the selected host, to establish a connection to the remote device." According to the plain claim language, the host must establish the connection with the remote device, not the remote.[5]

The specification is fully in accord. It describes a host-established connection in which the "host 60 sends a handshake to remote 10" to establish the "communication channel between the remote computer and [the] host." (Ex. 4 at 7:5-15.) The specification never describes a remote establishing a connection to the host.

The prosecution also confirms this. Route1 argued that the claimed methods were patentable precisely because they employed a "reverse connection" (*i.e.*, in which the host and not the remote establishes the connection). To secure allowance, Route1 distinguished the prior art Kiwimagi reference as follows:

> Kiwimagi fails to show or suggest the following features of [issued claim 1]: . . . sending an instruction, from the controller to the selected host, to establish a connection to the remote. ***Instead, Kiwimagi teaches that the remote takes the <u>initiative</u> to establish a connection to the host.***

(Ex. 5 at RT_00000344 (emphasis added).) Route1 further argued that "Kiwimagi teaches away from [claim 1] because [claim 1] requires the controller to instruct the host to establish a connection to the remote, whereas Kiwimagi teaches that the remote client requests a connection

---

[4] Although AirWatch has raised multiple other non-infringement and invalidity defenses, it raises only certain of these defenses in its motions for summary judgment and related briefing.
[5] The parties' differing constructions of the "sending an instruction," "host," and "parameters" limitations are the subject of AirWatch's request for additional claim construction briefing that is pending before the Court. (D.I. 191, 193.) Both the "sending an instruction" and "host" constructions bear on summary judgment issues.

directly from the host system."  (*Id.* at RT_00000294; *see also id.* at RT_00000335.)

Finally, Route1 admitted in another patent that the host establishes the connection with the remote.  In U.S. Patent No. 9,059,962, inventor Jerry Iwanski described the '216 patent as follows:  "The controller verifies the remote, and then ***tells the host computer to send a connection request to the remote device***."  (Ex. 28 at 1:35-48 (emphasis added).)  The claimed host in the '216 patent therefore must send the connection request, not the remote.

### b.     AirWatch's "host" does not establish the connection

As the preceding makes clear, claim 1 requires that the ***host*** take the initiative to establish the connection with the remote.  It is not enough that the ***remote*** send, and the host then accept, a connection request.

In the allegedly infringing AirWatch scenario, however, the remote establishes the connection to the host.  Specifically, the "mobile device" (*i.e.*, the alleged remote) "connects" to the e-mail server (*i.e.*, the alleged host) to request e-mail.  (*See, e.g.*, Ex. 22 (Akl Opening) ¶ 127 (citing Ex. 29 at AIR00031554).)  Because the remote device establishes the connection to the host and not the inverse, AirWatch cannot infringe.

To overcome this defect, Dr. Akl opines that "an instruction to establish a connection may include a host-initiated connection[] ***or a remote-initiated and host-accepted connection.***"  (Ex. 30 (Akl Reply) ¶ 31 (emphasis added).)  Per Dr. Akl, the meaning of "host establish[ing] a connection" is broad enough to encompass its precise opposite, *viz.*, that a "host accept[s] a connection request."  (*Id.*)

This cannot be correct.  Dr. Akl's reading contradicts the plain claim language and the specification.  It also contradicts the prosecution history, in which Route1 distinguished the Kiwimagi reference as "teach[ing] that the remote takes the initiative to establish a connection to the host."  Because the accused configuration employs a remote-established connection and not a

17

host-established connection, judgment of non-infringement is warranted.

**2.      AirWatch's products do not receive "a selection of the host."**

Step [1d] requires "receiving, at the controller, a selection of the host from the validated remote device."  According to the plain claim language, the "remote device" must send a "selection of the host" to the "controller."

Route1 alleges that a user's ability to enter or change his or her e-mail address from the Self-Service Portal on a remote device (shown below) satisfies this limitation:



Per Dr. Akl, "by accessing the SSP to change their email credentials[,] the user is selecting the Exchange Server [*i.e,* the host] with which they wish to communicate."  (Ex. 30 (Akl Reply) ¶ 25.)  Dr. Akl characterizes the user's selection as "***implicit*.**"  (*Id.* (emphasis added).)

Dr. Akl's "implicit selection" theory suffers from three defects.  First, a user of a mobile phone never actually selects the "host" (*i.e.,* the Exchange Server).  Instead, it is the AirWatch administrator who determines the user's Microsoft Exchange server via an administrative console.  The user cannot change that selection via the SSP.  (Snoeren Rebuttal ¶ 203.)

Second, as Dr. Snoeren explains in his expert report (and Dr. Akl concedes), there is no correlation between (i) the user's e-mail address, whether as entered or changed in the SSP and

18

(ii) the actual Microsoft Exchange server that serves his or her e-mail.  (*Id.* ¶¶ 197-204; Ex. 30

(Akl Reply) ¶ 25 (not disputing user cannot "select a different Exchange Server" from the SSP).)

Changing the user's address (*e.g.*, from "testemail@testserver.com" to "bob@biloxi.com") does

not impact the Microsoft Exchange server from which the user receives e-mail.

Third, Dr. Akl's position that the user's entry or modification of his or her e-mail address

satisfies the "selection" step contradicts his validity positions.  The Session Initial Protocol

("SIP") reference discloses the user's ability to enter a uniform resource identifier ("URI"),

which is "an email address of the form bob@biloxi.com."  (Ex. 31 at AIR00006000.)  To

distinguish the SIP reference, Dr. Akl argues that "merely . . . selecting a user [*e.g.*,

bob@biloxi.com], where the particular host computer to which the user will be connected is

unknown," does not satisfy the "selection" step.  (Ex. 25 (Akl Rebuttal) ¶ 108.)  But that is

exactly what a remote user is doing with the SSP.  If the user's entry of an e-mail address in SIP

is not an "implicit" selection, the same must be true for the SSP.

### 3.      AirWatch's products lack a "host."

Numerous claim steps refer to a "host."  Among other things, the host must (i) "connect[]

[to] the controller"; (ii) send the controller its "digital identity certificate"; and (v) "transport[]

data" to "the validated remote device."

Route1 does not dispute that no single component in the accused AirWatch configuration

satisfies all claim requirements for the "host."  Undeterred, Route1 draws an arbitrary box

around two components: it tethers (i) Microsoft Exchange, a Microsoft product for storing and

sending e-mail with (ii) the Enterprise Integration Service/AirWatch Cloud Connector, an

AirWatch component for passing information to servers (whether running Microsoft Exchange

or otherwise)—and argues that they together qualify as a "host."

Route1's attempt to cobble together two random components cannot satisfy the "host"

limitation.  First, Route1 concedes that neither computer standing alone is a host.  Second,

Route1 represented to the Court that a "pass-through" computer could not be a host.  But that is

precisely what the Enterprise Integration Service/AirWatch Cloud Connector is.  Because

AirWatch lacks the claimed "host," it cannot infringe.

### a.   No individual server is a host

The Court has construed "host" as a "computer (including hardware and software) that

has information or applications."  (D.I. 88.)  As Dr. Akl concedes, neither the "ACC nor

Exchange Server individually . . . meet the requirements of a host."  (Ex. 30 (Akl Reply) ¶ 9.)

Microsoft Exchange, for example, undisputedly does not "connect[] . . . to the controller"

(step [1b]) or send the controller its "digital identity certificate" for validation (step [1c]).

Likewise, the Enterprise Integration Service/AirWatch Cloud Connector undisputedly does not

"transport data" to a "validated remote device."

### b.   A host cannot be a pass-through computer

Unable to accuse a Microsoft Exchange server or Enterprise Integration Service/

AirWatch Cloud Connector individually as a "host," Route1 arbitrarily redraws the box.

According to Route1, a Microsoft Exchange server *in combination* with the ACC (or Secure E-

mail Gateway, when present) qualifies as a "host."  (*See, e.g.*, Ex. 30 (Akl Reply) ¶ 8; *accord id.*

¶ 10 ("It is precisely because the ACC and Exchange Server perform different functions that

their combination produces the host recited in Claim 1.").)

Route1 ignores that EIS/ACC and SEG are both "pass-through" or relay computers.  To

protect the security of its customers' networks, AirWatch designed components to prevent direct

communication between external computers running AirWatch's Console and a company's

internal corporate resources (*e.g.*, a Microsoft Exchange e-mail server).  (Ex. 32 at

AIR00043495; Snoeren Rebuttal ¶ 147.)

EIS/ACC, for example, sits between the Console and a corporation's internal resources and can pass requests from the Console to a Microsoft Exchange server.  (Ex. 33 at AIR00001106; Ex. 34 at AIR00004362 to -63.)  This "relay" functionality makes the EIS/ACC a pass-through server.  (Ex. 34 at AIR00004361 (ACC "is a network relay component.").)  EIS/ACC itself does not contain any information or application that a remote device may wish to access.  (Ex. 24 (Akl Dep.) at 142:9-143:8.)

The same is true of AirWatch's Secure E-mail Gateway.  As its name suggests, the SEG acts as a "gateway server," passing along requests to a Microsoft Exchange e-mail server only from approved mobile devices.  (Ex. 35 at AIR00003482 to -84; Ex. 32 at AIR00043495.)  The Exchange server then passes e-mail back through the SEG for delivery to approved devices.  The SEG does not store e-mail for later retrieval.  (Ex. 24 (Akl Dep.) at 141:15-142:8.)

In view of the pass-through functionality for both EIS/ACC and SEG, their inclusion in Route1's alleged "host" cannot be right.  During claim construction, Route1 agreed with AirWatch that a host cannot be a "pass-through" computer.  (*See, e.g.*, Ex. 36 at 47:21-48:9 (explaining that the "host" is a "computer . . . that you can use to obtain things. . . . It's not a pass-through.").)  When construing "host," the Court expressly relied upon this concession:

> [A] 'passthrough' computer does not ***contain*** any information, and instead acts as a sort of intermediary device.  Route1 agreed at the hearing that 'host' in the patent does not refer to such a 'pass-through' device.

(Mem. Op. (D.I. 85) at 5.)

Route1 now contends that the alleged "host" is a pass-through computer bolted to a Microsoft Exchange server.  But because the ACC and SEG are pass-through computers, and pass-through computers cannot be a "host" by Route1's admission, AirWatch cannot infringe.

**4.      AirWatch does not send "notifications from the selected host and the validated remote device that a connection exists."**

Step [1h] recites "receiving, at the controller, notifications from the selected host and the validated remote device that a connection exists therebetween."  Per the plain claim language, the controller must receive notifications from both the host and the remote.

Route1 alleges that: (i) the AirWatch Console and Device Services constitute the alleged "controller"; (ii) a Microsoft Exchange server combined with the ACC (and optionally the SEG) constitutes the alleged "host"; and (iii) a user's managed device constitutes the "remote device." Thus, to satisfy step [1g]'s notification requirements, Route1 must show two notifications:

- **Host notification**:  One from a Microsoft Exchange server combined with the ACC to the Console or Device Services;  and

- **Remote notification**:  A second from the managed device to the Console or Device Services.

Though Route1 presents alternative theories for these requirements, neither shows infringement.

Route1 first points to a log sent from either the SEG or the Microsoft Exchange server to the Console.  According to Dr. Akl, this log shows that the managed device contacted the Exchange server.  (Ex. 22 (Akl Opening) ¶ 135.)  Dr. Akl relies on this same log to satisfy the first notification (*i.e.,* from the host to the controller).  (*Compare id.* ¶ 135 *with id.* ¶¶ 138-139.)

Route1's theory that the same log from the SEG or the Microsoft Exchange server can satisfy both notification requirements cannot be correct.  The plain claim language requires separate "notifications" (plural).  Where as here "a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."  *Becton Dickinson and Co. v. Tyco Healthcare Grp.*, 616 F. 3d 1249, 1254 (Fed. Cir. 2010) (*quoting Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)). Moreover, a log from the alleged "host" (*i.e.,* a Microsoft Exchange server combined with the

ACC) is not "from the validated remote device."

Route1's second theory relates to an administrator's ability to view the total amount of data transferred to or from a managed device. (*See* Ex. 37; Ex. 38 at 5, 15; Snoeren Rebuttal ¶ 191.) This feature of the AirWatch Console allows administrators to determine whether a user will exceed or has exceeded his or her data allocation (*e.g.*, 10GB per month) and thus will cause the company to incur additional charges:



From the **Data** page you can view the data history of the last three billing cycles, in addition to the individual data transfers made and the amount of data sent and received.

(Ex. 38 at 17; *see also id.* at 5, 15; Snoeren Rebuttal ¶ 191.) According to Dr. Akl, this information about "data being transferred between a remote device and a host" satisfies the required notification from the remote. (Ex. 22 (Akl Opening) ¶ 136; *see also id.* -¶ 137.)

As the display above shows, however, this information is entirely agnostic as to "which connection" resulted in the data usage. The user could have, *e.g.*, used 322.56MB of data surfing the Internet, watching YouTube videos, or using Google Maps. (Snoeren Rebuttal ¶¶ 190-193.) Nothing about the depicted "data . . . transferred" shows that it related to a connection between the managed device and the alleged "host" (*i.e.*, a Microsoft Exchange server connected to the ACC). The depicted data usage also does not show that the managed device and the e-mail server are connected at all. Route1's alternative theory therefore also fails.

### 5.    Prosecution history estoppel bars Route1's equivalents theories.

Route1 attempts to assert the doctrine of equivalents for three limitations:

- "[V]alidating . . . digital identity certificates" (step [1d]) (Ex.22 (Akl Opening) ¶ 115; Ex. 30 (Akl Reply) ¶ 19);

- "[S]ending parameters" (step [1f]) (Ex. 30 (Akl Reply) ¶ 14); and

- "[R]eceiving . . . notifications" (step [1h]) (*Id.* ¶ 28).

Route1 added all three steps during prosecution.  Claim 1 as originally filed required only "receiving identifying information" and "validating [that] identifying information." (Ex. 5 at RT_00000026.)  Route1 submitted a Preliminary Amendment replacing these steps with the step of "validating digital identity certificates . . . ."  (*Id.* at RT_00000051.)  As part of that amendment, Route1 also added the "sending parameters" and "receiving . . . notifications" steps.

These amendments presumptively bar the assertion of equivalents under the doctrine of prosecution history estoppel.  *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys. Inc.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003) (prosecution history "estoppel presumptively applies" to claim amendments made during prosecution); *accord Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) ("Prosecution history estoppel . . . presumptively applies when the applicant made a narrowing claim amendment related to patentability.").  As the Supreme Court has explained, "a court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment" and bar the assertion of equivalents, absent sufficient contrary explanation.  *Warner-Jenkinson Co. v. Hilton Davis Chemical* Co., 520 U.S. 17, 33 (1997).

Although Route1 alleged that it was adding these limitations to "ensure [that] applicants claim[ed] all they [were] entitled to," all three amendments undisputedly were narrowing.  (*Id.* at RT_00000056.)  Its expert, Dr. Akl, has not attempted to explain why some exception (*i.e.*, the

unforeseeability of the alleged equivalent, the tangential relationship of the amendment to the alleged equivalent, or some other reason) overcomes the presumption that equivalents are not available under the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).  (Ex. 24 (Akl Dep.) at 145:23-147:25.)

That Route1 voluntarily narrowed its claims via a Preliminary Amendment is irrelevant. Both "amendments made for reasons other than to avoid prior art and voluntary amendments can give rise to prosecution history estoppel."  *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 272 F.3d 1365, 1377 (Fed. Cir. 2001) (in affirming summary judgment, rejecting argument that voluntary amendments do not give rise to estoppel); *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed. Cir. 2003) (same).  Because Route1 offers no evidence or explanation as to why the presumption does not bar its narrowing amendments, the Court should grant summary judgment of non-infringement as to its equivalents theories.

### C.      Route1's Patent Is Invalid.

A patent specification must contain "a written description of the invention."  35 U.S.C. § 112(a).  This description must demonstrate to a skilled artisan that the named inventors possessed and had invented the full scope of the claimed invention as of the patent filing date. *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  If the specification does not adequately describe a claim limitation, the claim is invalid.  *See id.*

Courts often find patents invalid as a matter of law for violating the written description requirement.  *See Bos. Sci. Corp. v. Johnson & Johnson,* 647 F.3d 1353, 1369 (Fed. Cir. 2011) (affirming summary judgment of inadequate written description); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1128 (Fed. Cir. 2008) (same); *Univ. Of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) (same); *see also Ariad*, 598 F.3d at 1353-54 (reversing denial of judgment as a matter of law for lack of written description).  "Conclusory

25

expert assertions" on the adequacy of written description "do not give rise to a genuine issue of material fact." *D Three Enters. LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018).

Here, step [1g] (and hence all claims) are invalid as lacking adequate written description. The step requires "sending an instruction, from the controller to the selected host, to establish a connection to the remote device."  (Ex. 4 at 10:19-20.)  Route1 amended claim 1 to add this limitation five years into prosecution, in response to the Examiner's sixth Office Action rejecting all claims.  (Ex. 5 at RT_00000291; Snoeren Opening ¶ 862.)  As alleged support for its amendment, Route1 pointed to box "525" labeled "[any]" in Figure 3A.

But neither that box nor the patent generally refers to an "instruction" from the controller to the host.  Route1's corporate designee and named inventor, Jerry Iwanski, was unable to identify any written description support for the "instruction" step during his deposition.  (Ex. 39 (Iwanski Dep.) at 148:3-151:8.)  Because "one skilled in the art, reading the [patent's] disclosure, [would not] immediately discern the [instruction step] at issue," the asserted claims are invalid. *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

During discovery, Route1 identified the following two excerpts from the specification (along with corresponding step 525 in Figure 3A) to support its contention that the '216 patent adequately described the "instruction" step:

> At step 620, controller 50 receives a message from remote 10 with the selected host, and makes this selection available to step 525, discussed below, along with the ***parameters*** for communicating with remote 10. . . .

> At step 525, controller 50 checks whether any parameters have been received for this host from step 620.  One of the hosts on the authorized host list will get parameters, the rest will not, since only one host-remote channel is being established.  ***Controller 50 forwards the parameters to the selected host*** and forwards a 'disconnect' message to the rest of the hosts on the list.

(Ex. 4 at 6:26-29, 61-67 (cited in Ex. 40 at 4) (emphasis added).)

Neither excerpt describes an "instruction" to the selected host to "establish a connection to the remote device."  Instead, they only describe the controller sending "parameters" concerning the remote device to the host.  Those "parameters" relate to a different step of claim 1—*i.e.*, "sending parameters for the validated remote device from the controller to the selected host."  Route1's position that these excerpts satisfy the "instruction" limitation would render the separate "parameters" step redundant.  (Snoeren Opening ¶¶ 861-863.)

Conceding that these excerpts do not expressly disclose the "instruction" step, Dr. Akl alleges that it can be "implied" from these excerpts.  Dr. Akl asserts that "[t]he parameters transmitted to the one host, together with the 'disconnect' message transmitted to the rest of the hosts, serve as at least an implied instruction to establish a connection."  This is the sum total of his substantive argument on written description.  (Ex. 25 (Akl Rebuttal) ¶ 196.)

Dr. Akl's one-sentence "implied instruction" argument is factually and legally incorrect.  Factually, "sending parameters" to a host does not necessarily instruct it to do anything.  (Snoeren Opening ¶ 864.)  Dr. Akl does not explain what this "implied instruction" is or how it can be "implied."  (Snoeren Reply ¶ 230.)  Nor does he explain how transmitting parameters to one host and disconnects to the others describes the claimed instruction step.  (*Id.*)

Legally, that a limitation "would have been apparent to one skilled in the art" is insufficient.  *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (1997).  As the Federal Circuit has explained, "[o]ne shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious."  *Id.*  The patent must describe the limitation "in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought."  *Id.*  The '216 patent did not do that here and thus is invalid.

### D.      Route1's Damages Expert Testimony Should Be Excluded.

As the "gatekeeper" of admissibility, the district court should exclude expert opinions that employ unreliable methodology or lack an adequate "fit" between the offered opinion and the facts at issue in the case. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 591 (1993) (internal citation omitted); Fed. R. Evid. 702. The party offering expert testimony must prove its admissibility by a preponderance of the evidence. *See Daubert* at 592 n.10.

Where, as here, a patentee seeks reasonable royalty damages, "[t]he Federal Circuit has repeatedly emphasized the importance of apportionment as part of a district court's gatekeeping function." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 U.S. Dist. LEXIS 167104, at *23-*24 (D. Del. Sept. 28, 2018) (*citing VirnetX, Inc. v. Cisco, Sy*s., 767 F.3d 1308, 1328 (Fed. Cir. 2014); *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301-02 (Fed. Cir 2015); *Ericsson v. D-Link Sys.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2014). Apportionment safeguards the "essential requirement . . . that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *CSIRO*, 809 F.3d at 1301 (*quoting Ericsson*, 773 F.3d at 1226).

To adequately apportion, an expert's reasonable royalty analysis must "carefully tie proof of damages to the claimed invention's footprint in the market place." *VirnetX*, 767 F.3d at 1329 (quotation marks omitted). For multi-feature products, the damages expert must "apportion value between the patented [and] . . . non-patented features contained in the accused products." *Id.* "[A]pportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.'" *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp*., LLC, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (quoting *Ericsson*, 773 F.3d at 1226).

Although the Federal Circuit has not prescribed a rigid framework for apportionment, the patentee's separation of patented and unpatented features must rely on evidence that is "reliable and tangible, and not conjectural or speculative." *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018) (*quoting Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  To avoid the risk that the jury will overcompensate the patentee, experts also should not present the entire market value of a multi-component product and then apportion by "dramatically reducing the royalty rate."[6] *Ericsson*, 773 F.3d at 1226-27 (citing *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012)).

### 1. Mr. Haas's failure to apportion warrants exclusion.

Mr. Haas's failure to apportion reasonable royalty damages leads to an unreliable and overstated damages figure.  What he terms an "apportionment analysis" is just an identification of products—which he admits contain both alleged infringing and non-infringing features— within a suite of software.  That is not the required apportionment.  As this methodological defect permeates all of his damages testimony, the Court should exclude it in its entirety.

Mr. Haas first identifies a royalty base of the smallest saleable patent practicing unit ("SSPPU") within the broader accused products suites.  He then multiplies that royalty base by a ██████ derived from two purportedly comparable industry licenses and a third-party asset valuation.  Both steps, however, fail to account for numerous features in the accused products that have nothing to do with Route1's infringement theory.  Mr. Haas thus fails properly to apportion either in his base or in his rate.  The result is an unapportioned reasonable royalty calculation untethered to the '216 patent's footprint in the marketplace.

### a. Mr. Haas fails to apportion his royalty base

---

[6] Route1 has not contended that the entire market value rule applies in this case.

Mr. Haas calculates his royalty base by taking the value of AirWatch's EMM products (*see* Ex. 42 (Haas Opening) ¶¶ 65-68) and then narrowing to those products with the purportedly infringing feature—what he calls his "apportioned base" and the product of an "SSPPU apportionment analysis." (*Id.* ¶¶ 14, 67.) But Mr. Haas's analysis misses a required step: he fails to identify the portion of his royalty base attributable to the accused feature and instead includes numerous non-accused features. *See Virnetx, Inc.*, 767 F.3d at 1329 ("[A] patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features."). He did not remove the value of non-infringing features as required. *See Ericsson*, 773 F.3d at 1227.

Mr. Haas admits that the accused AirWatch products contain non-infringing features. (Ex. 27 (Haas Dep.) at 91:25-92:4; *see also* Hitt Rebuttal ¶¶ 55-62; Davis Rebuttal at 29-30.) AirWatch retained an expert, Lorin Hitt, to conduct the required apportionment to account for these features. Mr. Hitt identifies at least 18 different capabilities in AirWatch's mobile device management ("MDM") software alone—only one of which directly relates to the asserted technology. (Hitt Rebuttal ¶ 59.) And the evidence indicates that it is the non-infringing features that drive significant customer demand. (*Id.* ¶¶ 85-99; Ex. 46; Ex. 47 at AIR00047710; Ex. 13 at AIR00047724; Ex. 17 at AIR00046580.)

By using the full value of all MDM, mobile email management ("MEM"), and AirWatch Inbox-related components as his royalty base without further reduction to exclude the value of non-infringing features (*see* Ex. 27 (Haas Dep.) at 93:8-94:5), Mr. Haas overstates the royalty base significantly. This results in a legally flawed damages opinion. *See VirnetX*, 767 F.3d at 1329 ("patented feature must be separated" from other components); Hitt Rebuttal ¶ 29.) Compounding this error, Mr. Haas intends to tell the jury that he did apportion and is presenting

30

an "apportioned base reflecting the equivalent infringing revenue value." (Ex. 42 (Haas Opening) ¶ 14.) This would be inconsistent with Federal Circuit law and create a "considerable risk" of misleading the jury into overcompensating Route1. *Ericsson*, 773 F.3d at 1227.

### b.     Mr. Haas fails to apportion his royalty rate

The next step of Mr. Haas's reasonable royalty methodology multiplies his royalty base by a █████████. The only bases for that rate are the following:

(1) A license between non-parties SAIC and VirnetX that licensed and assigned a portfolio of patents and patent applications (the "VirnetX agreement");

(2) A technology transfer agreement between non-parties StrikeForce and BlockSafe that transferred unpatented inventions, confidential information, patent rights, know-how, and trade secrets (the "BlockSafe agreement"); and

(3) ████████████████████████████████████

(Ex. 42 (Haas Opening) ¶¶ 120, 124-127, Ex. 5.1.) Each of those references applies a █████, subject to varying economic limitations. (*Id.*)

To defend his failure to apportion the royalty base, Mr. Haas claimed at his deposition that his royalty rate itself reflected apportionment. (Ex. 27 (Haas Dep.) at 93:8-17.) But that claim is not supported by his use of a █████████ without reduction, and his belated attempt to identify this purported "apportionment" rings hollow.

First, Mr. Haas's royalty rate analysis contains no quantifiable apportionment. His rate calculation is based only on supposedly comparable licenses and a valuation of AirWatch's entire portfolio of technology—with no meaningful separation between the allegedly infringing features and everything else. (*See, e.g.*, Ex. 42 (Haas Opening) ¶¶ 126-127.) Mr. Haas's ████ "starting point" (*id.* ¶ 145) is identical to the █████ that he ultimately applies. (*Id.* at Ex. 3.)

Second, Mr. Haas's report repeatedly refers to his royalty base calculation—not his

31

royalty rate—as reflecting his "apportionment" analysis.  (*Id.* ¶ 14 ("the appropriate

compensation for Defendant's infringement of the '216 Patent would be a reasonable royalty of

▮▮ applied to an apportioned base"); *id.* ¶ 67 ("my analysis included MDM, MEM, and SEG

pricing in the SSPPU apportionment analysis"); *id.* ¶ 85 ("I have apportioned the revenue

associated with the Accused Products to isolate a royalty base . . ."); *id.* ¶ 132 ("I have

apportioned away approximately 75% of Accused Product revenue prior to the application of any

royalty rate . . ."); *see also id.* ¶¶ 65-70, 120, 127, & 137.)

Third, Mr. Haas's reply report confirms that his royalty base analysis, not his rate

analysis, reflects his attempt to apportion.  (Ex. 19 (Haas Reply) ¶ 23 (representing that his

"royalty base has been reduced to include only" elements potentially covered by the '216

Patent"); *id.* ¶ 24 (characterizing his royalty base as "apportion[ing] accused sales down to the

accused components").)  In that report, he criticizes AirWatch's damages expert, Julie Davis, for

applying his royalty base and then performing rate apportionment:  "Ms. Davis' adjustment of

the ▮▮▮▮▮▮▮ is unnecessary because of apportionment steps I have already performed in

the calculation of my royalty base, which she adopts in part."  (*Id.* ¶ 22 (emphasis added).)

Route1 may attempt to counter that the following statement in Mr. Haas's report reflects

his rate apportionment:  "AirWatch's contributions to the Accused Products . . . would result, in

isolation, in a modest reduction to the ▮▮ starting point."  (Ex. 42 (Haas Opening) ¶ 145.)  But

Mr. Haas never quantified the value of these "AirWatch[] contributions."  These "contributions"

encompass numerous features that the evidence indicates drive significant demand, (*see* Hitt

Rebuttal ¶¶ 85-99; Ex. 46; Ex. 47 at AIR00047710; Ex. 13 at AIR00047724; Ex. 17 at

AIR00046580), and Mr. Haas admits that AirWatch owns "hundreds of its own patents and

patent applications" relating to these contributions (Ex. 42 (Haas Opening) ¶ 129).

Paying lip service to the significant non-patented features in the accused products is not apportionment, and allowing a patent damages expert to use a "cursory analysis to circumvent the apportionment requirement would effectively gut the doctrine." *Bio-Rad*, 2018 U.S. Dist LEXIS 167104 at *24 (excluding opinions of expert who performed cursory royalty rate apportionment).  Mr. Haas's failure to apportion between the patented and non-patented features renders his opinions unreliable under *Daubert* and Rule 702 and warrants their exclusion.

### 2.      Mr. Haas fails to tie his royalty calculations to actual uses of the claimed method.

As noted above, Route1 seeks damages on every U.S. sale of the accused products— regardless of whether those products have ever been used in an infringing manner.  (Ex. 27 (Haas Dep.) at 96:10-97:11, 99:19-23, 159:25-160:24.)  Route1 assumes that all of AirWatch's U.S. sales of the accused components infringe.  (Ex. 22 (Akl Opening) ¶ 83.)

As Route1 cannot show specific instances of infringement or that combining the various optional components necessarily infringes, Mr. Haas's opinion that the royalty base should include all of AirWatch's U.S. sales of the accused components is methodologically defective. *See, e.g.*, *Eagle Harbor Holdings, LLC v. Ford Motor Co.*, No. C11-5503 BHS, 2015 WL 12670404, at *2 (W.D. Wash. Mar. 9, 2015) (excluding damages expert opinion that "failed to cite any evidence of actual use of the [accused] feature" and instead relied upon "speculation regarding actual use.")  This disconnect between the actual evidence and the assumptions underlying Mr. Haas's damages opinions warrant their exclusion under *Daubert.*

### 3.      Mr. Haas's comparable license analysis should be excluded.

In determining the reasonable royalty, an expert witness may rely on existing royalty agreements negotiated at arms-length—as long as those agreements are "sufficiently comparable to the hypothetical license at issue in suit."  *Lucent I*, 580 F.3d at 1325.  The proponent of a

license must establish both the economic and technological comparability of the asserted technology and that covered by the license.  *See M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675-76 (D. Del. 2016).  "[L]oose, vague allegations of technological comparability, without any explanation, are insufficient, and do not even provide a basis to meaningfully assess technological comparability." *Id.* at 677-78 (*citing LaserDynamics*, 694 F.3d at 79).

### a. Mr. Haas does not show his licenses are technologically comparable

As noted above, Mr. Haas bases his royalty rate on two third-party licenses from public databases—the VirnetX and BlockSafe agreements—and ███████████████████████████ ███████████████████████ y.  But Route1 and Mr. Haas never establish that the third-party licenses are technologically comparable to the hypothetical license here.

The entirety of Route1's analysis of technological comparability of the VirnetX and BlockSafe agreements consists of the following statement in Mr. Haas's opening report:

> Dr. Akl has informed me that the technology licensed in this agreement is similar and relevant to the technology described in the '216 Patent.

(Ex. 42 (Haas Opening) ¶¶ 124-125.)  While Mr. Haas's exhibits provide a broad "technology description" of these and other licenses, the exhibits contain no analysis of how that technology description relates to the '216 patent.  (*See id.*, Ex. 5.2.)  Dr. Akl's reports, too, contain no discussion of technological comparability whatsoever.

Route1's experts' alleged comparability analyses are no more than opinions that the licenses are "similar and relevant."  (*Id.* ¶¶ 124-125.)  Such "[l]oose, vague allegation[s] of technological comparability" should be excluded as lacking "any meaningful analysis" and "nothing more than *ipse dixit.*"  *M2M*, 167 F. Supp. 3d at 677-78; *see also Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-679-RGA, 2019 U.S. Dist. LEXIS, at *47-*48 (D. Del. Mar. 9, 2019) (excluding opinions where damages expert provided "broad and nebulous language" supporting

34

technological comparability and technical expert "[did] not provide any analysis").

Mr. Haas's analysis about the alleged technological comparability of these third-party licenses also should be excluded for lack of factual support.  Courts in this District have made clear that a damages expert's reasonable royalty testimony must be excluded where the "only rationale for comparability was undisclosed conversations with a technical expert."  *M2M*, 167 F. Supp. 3d at 677-78 (excluding expert opinions where the only testimony on comparability was that the licenses "all relate to product features rather than core technology.")

Here, the alleged factual basis for Mr. Haas's conclusions stems from a phone call between Mr. Haas and Dr. Akl.  When asked what he and Dr. Akl discussed regarding the technology underlying the VirnetX license, however, Mr. Haas testified that Dr. Akl did not describe (and Mr. Haas did not ask) "how it is similar and relevant to the technology described in the '216 patent."  (Ex. 27 (Haas Dep.) at 139:13-140:1.)  Mr. Haas's related opinions therefore should be excluded.  *See Parallel Networks Licensing LLC v. IBM*, No. 13-2072 (KAJ), 2017 U.S. Dist. LEXIS 58394, at *3-*4 (D. Del. Apr. 17, 2017) (party cannot rely on expert opinions not disclosed in expert report, unless failure to disclose was substantially justified or harmless).

**b.      Mr. Haas does not show his licenses or ██████████ are economically comparable**

Mr. Haas also fails to show that the VirnetX and BlockSafe licenses and ████████ ████████ are economically comparable.  *See Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("stress[ing] that comparisons of past patent licenses to the infringement must account for the . . . economic differences between them") (quotation marks omitted).  Although neither of the licenses involves AirWatch, Route1, or the '216 patent, Mr. Haas opines that they "appeared, based on their terms, to be economically comparable to the circumstances at the hypothetical negotiation."  (Ex. 42 (Haas Opening) ¶ 123.)

But he goes no deeper than observing that both licenses "include[] running royalty rates represented as a percentage of revenue" and were "meant to be applied to entire software products." (*Id.* ¶¶ 126-127.)  Particularly as the VirnetX and Blocksafe agreements' relation to "entire software packages" is a distinguishing factor (which Mr. Haas acknowledges), his "unsubstantiated conclusions about economic comparability, lacking in analysis, again provide nothing more than *ipse dixit*."  *M2M*, 167 F. Supp. 3d at 678; *see* Ex. 42 (Haas Opening) ¶ 127.

Even a cursory review of the VirnetX and BlockSafe licenses reveals significant economic differences between those agreements and the hypothetical license here.  The VirnetX agreement is not a bare license, but a "Patent License and ***Assignment Agreement.***"  (Ex. 20 at 1 (emphasis added).)  The agreement obligated the licensor to "unconditionally and irrevocably convey, transfer, assign and quitclaim to [VirnetX] all of its right, title and interest in and to" an entire portfolio of patents and patent applications, once VirnetX obtained financing and prepared an acceptable business plan.  (*Id.* at 2, 9; Ex. 27 (Haas Dep.) at 140:17-141:5 (Mr. Hass acknowledging his awareness of the assignment provision).)  Even before this assignment, VirnetX was granted an exclusive*,* sub-licensable license to the patent portfolio.  (Ex. 20 at 6.)  Mr. Haas provides no analysis of these vast economic differences with the non-exclusive, non-assignable hypothetical license in this case.

Likewise, Mr. Haas does not account for the BlockSafe agreement being a non-arm's length contract between a parent and its newly-formed subsidiary that conveys significant non-patent rights.  The BlockSafe agreement is a January 3, 2018, IP license agreement between StrikeForce Technologies, Inc. (licensor) and BlockSafe Technologies Inc. (licensee).  (Ex. 21 at 1.)  Six days after signing this agreement, StrikeForce issued a press release announcing "the opening of a new subsidiary, BlockSafe Technologies, Inc." and that "StrikeForce [would]

36

license its existing technologies to BlockSafe . . . ."  (Ex. 41 at 1.)  BlockSafe is "owned 49% by the [StrikeForce] and 31% by three executive officers of [StrikeForce]."  (Ex. 44 at 10.) Mr. Haas admitted in his deposition that he did not consider the parties' relationship when he included the BlockSafe agreement as a comparable license.  (Ex. 27 (Haas Dep.) at 142:18-143:17.)  Nor do his expert reports account for this parent-subsidiary relationship.

Moreover, the BlockSafe agreement conveyed not just patent rights, but the sole right to the "unpatented inventions, the Confidential Information, . . . the Know-How, and the Trade-Secrets" underlying StrikeForce's technology.  (Ex. 21 at 3.)  While Mr. Haas acknowledges that the BlockSafe agreement conveyed "non-patent intellectual property," he opines only that the parties "would have considered" this factor at the hypothetical negotiation.  (Ex. 42 (Haas Opening) ¶ 128.)  But Mr. Haas does not analyze how this factor may have affected the negotiated rate.  *See Zimmer*, 2019 U.S. Dist. LEXIS 37349, at *48 (excluding expert who failed to provide such analysis about the settlement context of a comparable license).

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

As Mr. Haas does not satisfy the basic prerequisites for presenting the VirnetX and

BlockSafe agreements and the ████████████ as comparable licenses, the Court should

exclude his royalty rate analysis.

IV.     **CONCLUSION**

The fundamental differences between AirWatch's and Route1's technologies force

Route1 to apply the '216 patent in a tortured manner.  Route1 must interpret "establish" as

"accept," draw a box around components from different companies for the "host," and argue that

one "notification" satisfies two.

These differences—together with the lack of proof that anyone has ever performed the

patented steps and the estoppel from Route1's claim amendments—warrant summary judgment

of non-infringement and no damages.  So, too, the lack of written description support for the

"instruction" claim amendment justifies judgment that the '216 patent is invalid.

Finally, Route1 achieves its outsized $20+ million damages demand only by not

apportioning, by not tying his royalty calculations to actual use of the claimed method, and by

relying on licenses and a valuation that are technologically and economically incomparable.  As

Route1's damages opinions violate established Federal Circuit authority, the Court should

exercise its gatekeeping function and exclude them.

I further certify that on April 18, 2019, I caused a copy of the foregoing sealed document to be served by e-mail on the above-listed counsel.

Dated: April 18, 2019

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Elena C. Norman (No. 4780)
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
enorman@ycst.com
agaza@ycst.com
swilson@ycst.com

*Attorneys for AirWatch LLC*

23939454.1

2

## CERTIFICATE OF SERVICE

I, Samantha G. Wilson, Esquire, hereby certify that on April 25, 2019, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Dominick T. Gattuso
HEYMAN ENERIO GATTUSO
 & HIRZEL LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
*dgattuso@hegh.law*

*Attorneys for Plaintiff Route1 Inc.*

Michael J. Garvin
Marcel C. Duhamel
Aaron M. Williams
VORYS, SATER, SEYMOUR
AND PEASE LLP
200 Public Square, Suite 1400
Cleveland, OH 44114-2327
*mjgarvin@vorys.com*
*mcduhamel@vorys.com*
*amwilliams@vorys.com*

William H. Oldach III
VORYS, SATER, SEYMOUR
AND PEASE LLP
1909 K Street NW
Washington, D.C. 20006-1152
*wholdach@vorys.com*

Rex W. Miller, II
VORYS, SATER, SEYMOUR
AND PEASE LLP
52 E. Gay Street
Columbus, OH 43215
*rwmiller@vorys.com*

*Attorneys for Plaintiff Route1 Inc.*

01:22018055.1

I further certify that on April 25, 2019, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel.

Dated: April 25, 2019

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Elena C. Norman (No. 4780)
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
enorman@ycst.com
agaza@ycst.com
swilson@ycst.com

*Attorneys for AirWatch LLC*

01:22018055.1

## CERTIFICATE OF SERVICE

I, Samantha G. Wilson, Esquire, hereby certify that on April 25, 2019, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Dominick T. Gattuso
HEYMAN ENERIO GATTUSO
 & HIRZEL LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
*dgattuso@hegh.law*

*Attorneys for Plaintiff Route1 Inc.*

Michael J. Garvin
Marcel C. Duhamel
Aaron M. Williams
VORYS, SATER, SEYMOUR
AND PEASE LLP
200 Public Square, Suite 1400
Cleveland, OH 44114-2327
*mjgarvin@vorys.com*
*mcduhamel@vorys.com*
*amwilliams@vorys.com*

William H. Oldach III
VORYS, SATER, SEYMOUR
AND PEASE LLP
1909 K Street NW
Washington, D.C. 20006-1152
*wholdach@vorys.com*

Rex W. Miller, II
VORYS, SATER, SEYMOUR
AND PEASE LLP
52 E. Gay Street
Columbus, OH 43215
*rwmiller@vorys.com*

*Attorneys for Plaintiff Route1 Inc.*

01:22018055.1

I further certify that on April 25, 2019, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel.

Dated: April 25, 2019

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Elena C. Norman (No. 4780)
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
enorman@ycst.com
agaza@ycst.com
swilson@ycst.com

*Attorneys for AirWatch LLC*

01:22018055.1