IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROUTE1 INC.,                           )
                                       )
          Plaintiff /Counterclaim      )
          Defendant,                   )
                                       )
     v.                                )     Civil Action No. 17-cv-331 (KAJ)
                                       )     **FILED UNDER SEAL**
AIRWATCH LLC,                          )
                                       )
          Defendant/Counterclaim       )
          Plaintiff.                   )

_____

MEMORANDUM OPINION

_____

Dominick T. Gattuso, Heeeyman Enerio Gattuso & Hirzel LLP, 300 Delaware Avenue, Ste. 200, Wilmington, DE 19801, *Counsel for Plaintiff and Counterclaim Defendant*
          Of Counsel:   Michael J. Garvin, Marcel C. Duhamel, Aaron M. Williams, Vorys, Sater, Seymour and Pease, LLP, 200 Public Square, Ste. 1400, Cleveland, OH 44114
                        William H. Oldach III, Vorys, Sater, Seymour and Pease, LLP, 1909 K Street N.W., 9th Fl., Washington, DC 20006
                        Rex M. Miller, II, Vorys, Sater, Seymour and Pease, LLP, 52 E. Gay Street, Columbus, OH 43215

Elena C. Norman, Anne Shea Gaza, Samantha G. Wilson, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 198011, *Counsel for Defendant and Counterclaim Plaintiff*
          Of Counsel:   Michael A. Jacobs, Richard S.J. Hung, Christopher J. Wiener, Morrison & Foerster LLP, 425 Market Street, San Francisco, CA 94105
                        Bita Rahebi, Morrison & Foerster LLP, 707 Wilshire Boulevard, Los Angeles, CA 90017

_____

August 7, 2019
Wilmington, Delaware



JORDAN, *Circuit Judge sitting by designation.*

This suit by Route1 Inc. ("Route1") against AirWatch LLC ("AirWatch") asserts infringement of U.S. Patent No. 7,814,216 (the "'216 patent"). Presently before me are the following: (1) a supplemental claim construction issue (D.I. 191, 193); (2) AirWatch's motion for summary judgment of non-infringement and invalidity (D.I. 199); (3) AirWatch's *Daubert* motion seeking exclusion of Route1's damages expert (D.I. 200); and (4) Route1's *Daubert* motion seeking exclusion of AirWatch's damages expert (D.I. 197).

AirWatch's request for additional claim construction (D.I. 191) will be granted. As a consequence of my decision on the disputed claim language, AirWatch's motion for summary judgment (D.I. 199) will be granted in part, since, given the evidence, there is no plausible basis for saying that AirWatch's system infringes the '216 patent. As a further consequence, both parties' *Daubert* motions (D.I. 197, 200) will be denied as moot. I will, however, deny AirWatch's summary judgment motion as to the alleged invalidity of the '216 patent.

## I.   INTRODUCTION

The parties are well aware of the background of this case, so I recite only those facts relevant to the motions at hand.

Generally, the technology described in the '216 patent is directed to a means for remote computing access, "enabling peer-to-peer communication" between a host computer and remote device over a communication network. ('216 Pat. 1:7-10.) The

2

'216 patent claims a method by which users of "remote devices" can connect to "hosts" through an interfacing component, a "controller."[1] ('216 Pat. 1:46-56.)

That technology generally operates according to the steps listed in claim 1.[2]  First, the controller, a "general purpose computer" that "performs authentications, authorization and communications protocol management functions[]" ('216 Pat. 2:64-3:3), connects with a host, a "general purpose computer programmed according to the present invention,

---

[1] The experts for both sides agree that the technology could include, for example, a mobile phone connecting to a company server, enabling remote access to a work desktop. ('216 Pat. 1:32-37; D.I. 218-1 (Akl Rpt.) ¶ 55; D.I. 202-1 (Snoeren Rebuttal Rpt.) ¶¶ 136-38.)

[2] Claim 1, the only independent claim, reads as follows:
"A method of enabling communication between a host and a remote device using a controller, comprising:
    connecting the controller to the host;
    connecting the controller to the remote device, the host and the remote device being in separate locations;
    validating, at the controller, digital identity certificates received from each of the host and the remote device, each identity certificate containing (i) the public half of an asymmetric key algorithm key pair, (ii) identity information, and (iii) a digital signature of the issuing certificate authority, thereby converting the host to a validated host, and converting the remote device to a validated remote device;
    receiving, at the controller, a selection of the host from the validated remote device;
    sending parameters for the validated remote device from the controller to the selected host;
    sending an instruction, from the controller to the selected host, to establish a connection to the remote device;
    receiving, at the controller, notifications from the selected host and the validated remote device that a connection exists therebetween; and
    after receiving notice of a connection between the selected host and the validated remote device refraining from involvement, at the controller, in transporting data between the selected host and the validated remote device, so that the selected host and the validated remote device subsequently communicate with each other without using any resource of the controller."
('216 Pat. 10:2-30.)

typically a personal computer executing a Windows operating system[]"[3] ('216 Pat. 2:60-62; 10:1-4). Then, the controller connects to a remote device, "such as a laptop computer, tablet computer, PDA, or mobile phone." (D.I. 218-1 ¶ 60; *see also* '216 Pat. 10:5-6; D.I. 202-1 ¶ 74.) Those are the three major players here: a remote device, a controller, and a host.

Next, the controller validates both the remote device's and the host's legitimacy by examining a set of digital identifiers. ('216 Pat. 10:7-14.) At that point, the remote device selects a host, notifying the controller. ('216 Pat. 10:15-16.) Then, the controller sends "parameters," or the necessary information to setup the peer-to-peer connection, to the selected host.[4] ('216 Pat. 10:17-18.)

After the validation and parameters steps, the controller sends "an instruction, from the controller to the selected host, to establish a connection to the remote device[.]" ('216 Pat. 10:19-20.) I will be referring to that limitation as the "instruction" limitation, or Step 1g. After the operation described in the "instruction" limitation, and after a connection has been made between the host and the remote device, the controller receives notifications from both the host and remote device verifying that connection. ('216 Pat. 10:21-23.) Lastly, once the connection is made, the controller must "refrain[] from

---

[3] The parties vigorously dispute whether a host must be a single component, e.g., a general computer, or whether it can be multiple components functioning as a general computer, e.g., a network/cloud coupled with an email server. (D.I. 201 at 19-20; D.I. 228 at 17-18.)

[4] The parties dispute the meaning of several limitations, including the "parameters" limitation, and I will reference those limitations herein for descriptive purposes, but those disputes are not material at this point – the case turns on a single limitation, the "instruction" limitation. (D.I. 253 at 9.)

involvement[] … in transporting data between the selected host and the validated remote device, so that the selected host and the validated remote device subsequently communicate with each other without using any resource of the controller." ('216 Pat. 10:24-30.)

Relevant to its theories of infringement, Route1 identifies two different configurations of AirWatch's accused products, which it contends embody two distinct forms of the claimed "host." (D.I. 218-1 ¶ 88; D.I. 228 at 14-15, 17-18.) Route1 first argues that "the Secure Email Gateway (SEG),[5] which is connected to the Exchange Server[]" amounts to a host, as claimed in the '216 patent. (D.I. 228 at 15; D.I. 218-1 ¶ 88.) Alternatively, Route1 contends that "an AirWatch customer's email system [or the Exchange Server],[6] in combination with the [AirWatch Cloud Connector]" ("ACC"),[7] amounts to the same. (D.I. 218-1 ¶ 88; *see* D.I. 228 at 18 ("[T]he host is not limited to [the ACC] but also includes the Exchange Server, … i.e., email.").) In short, the first

---

[5] According to Dr. Snoeren, AirWatch's invalidity and non-infringement expert, the SEG is "an optional network service that sits in front of, and controls access to, an email server." (D.I. 202-1 ¶ 107 (citation omitted).)

[6] Dr. Snoeren says that the "Exchange Server is an email server from Microsoft. It is software that companies and other organizations use to setup email mailboxes to allow end users to send and receive email." (D.I. 202-1 ¶ 123.)

[7] Dr. Snoeren describes the ACC as "an optional component that provides for integration between AirWatch's servers and other back-end enterprise systems that provide access to corporate resources, which are typically not provided by AirWatch, such as directory services and certificate services. … ACC is designed so that corporate resources behind a corporate network firewall do not need to communicate directly with other components, … that are located outside of the corporate network firewall." (D.I. 202-1 ¶ 110 (citation omitted).)

configuration identifies an email platform and an email inbox; the second configuration

identifies an email inbox and an AirWatch component enabling cloud connectivity.

This case was initially assigned to the Honorable Richard Andrews, but was

subsequently re-assigned to me. Judge Andrews had previously conducted a *Markman*

hearing and issued claim construction rulings, untangling much of the technical

complexity of the patent's terms. "Once and done" should be the rule when it comes to

claim construction, but there are exceptions. AirWatch submitted a letter memorandum,

on March 14, 2019, "to bring additional claim construction disputes to the Court's

attention and to seek the Court's guidance on how to proceed[]" (D.I. 191 at 1), and it has

now asked me to construe the "instruction" limitation, Step 1g, of claim 1. The operative

language reads: "sending an instruction, from the controller to the selected host, to

establish a connection to the remote device[.]" ('216 Pat. at 10:19-20.) Given the two

allegedly infringing configurations advanced by Route1, I must determine whether either

infringes. As to the first configuration, I must determine whether the SEG and Exchange

Server instruct the host to establish a connection with the remote device. And for the

second configuration, I must determine whether the ACC and Exchange Server do the

same.

According to AirWatch, Route1 has tried to expand the meaning of the

"instruction" limitation through the testimony and reports of its infringement expert, Dr.

Robert Akl. (D.I. 191 at 1-3.) That expanded construction, in AirWatch's view, is not

supported by the '216 patent's claim language, specification, and prosecution history.

Route1 responded in a letter memorandum on March 21, 2019, disagreeing that its expert had done anything improper and opposing any further claim construction. (D.I. 193.)

During the pendency of that request for additional claim construction, AirWatch moved for summary judgment of non-infringement and invalidity. Regarding non-infringement, it argued that, with an appropriate understanding of the "instruction" limitation, there was no infringement as a matter of law. As to invalidity, it argued that the "instruction" limitation fails to satisfy the written description requirement of 35 U.S.C. § 112. Additionally, both parties filed *Daubert* motions, Route1 seeking to exclude AirWatch's damages expert and AirWatch to exclude Route1's damages expert. (D.I. 197, 200.)

On June 26, 2019, I held oral argument on the dispositive motions and the *Daubert* motions, as well as the claim construction dispute.

## II.     LEGAL STANDARDS[8]

### A.     Claim Construction

Patent claims are construed as a matter of law. "[T]he words of a claim are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and internal quotation marks omitted). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in

---

[8] This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. If the meaning of a claim term is not readily apparent, the court may look to "the words of the claims themselves, … the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citation and internal quotation marks omitted). During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* at 1324.

### B.    Summary Judgment

Federal Rule of Civil Procedure 56 states that summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of establishing that there are no genuine disputes of material fact and that there is entitlement to judgment as a matter of law.

8

## III.   DISCUSSION

By way of preview, I first construe the "instruction" limitation and conclude that it encompasses only host-initiated, not remote-initiated, connections.  Next, based on that construction, I consider literal infringement – the only infringement theory at issue – and conclude that there is none because AirWatch's products practice only remote-initiated connections.  The need for infringement damages testimony is thus obviated and the parties' *Daubert* motions are made moot.  Finally, I consider the argument that the '216 patent is invalid for lack of written description, and I determine that genuine disputes of fact preclude summary judgment on that issue.

### 1.  Claim Construction

Although the parties have raised other claim construction concerns, I limit my discussion to the "instruction" limitation, since it is dispositive of the pending summary judgment motion as to infringement.  That limitation, again, Step 1g of claim 1, requires "sending an instruction, from the controller to the selected host, to establish a connection to the remote device[.]"  ('216 Pat. at 10:19-20.)

AirWatch argues that the patent's disclosure supports only a construction of the "instruction" limitation that is confined to host-initiated connections.  (*See* D.I. 201 at 16 ("[T]he host must establish the connection with the remote device, not the remote.").)  While the "instruction" limitation was not addressed at the *Markman* hearing, I will nevertheless construe it now because, after the *Markman* hearing, Route1 submitted Dr.

Akl's expert report, which offers an arguably new opinion pertaining to the "instruction" limitation.[9]

Dr. Akl opined that "[a] person of ordinary skill in the art would understand that an instruction to establish a connection may include a host-initiated connection, or a remote-initiated and host-accepted connection." (D.I. 218-3 (Akl Reply Rpt.) ¶ 31.) AirWatch contends that Dr. Akl's opinion "is contrary to the claim language, the specification, and the file history." (D.I. 191 at 2.)   In AirWatch's view, the "claimed host in the '216 patent … must send the connection request, not the remote." (D.I. 201 at 17.)   Hence, it has requested that I construe the "instruction" limitation to mean "sending an instruction, from the controller to the selected host, for the host to establish a connection to the remote device." (D.I. 191 at 3.)   Route1 counters that the plain language of Step 1g encompasses both a host-initiated connection and a remote-initiated connection.  (D.I. 193 at 4.)

AirWatch has much the stronger position.  Its proposed construction of the "instruction" limitation comports with the language of the '216 patent, the patent's

_____

[9] The emergence in expert reports of new theories of infringement, after the court has given its claim construction rulings, is nothing new.  In *Cadence Pharmueticals, Inc. v. Innopharma Licensing LLC*, No. 14-1225-LPS, 2017 WL 39560, at *1 (D. Del. Jan. 4, 2017), the court said:

> [The parties] attack each other for having introduced new claim
> constructions into the case through expert reports and, consequently, the
> parties have filed [a slurry of motions] and discovery dispute letters.  In
> general, the Court has determined that the appropriate course of action
> under the circumstances is to allow each party to present the case it wishes
> to present – including whatever has been disclosed in each of the expert
> reports that have been served – and to determine at an appropriate time if
> any further claim construction is necessary.

specification, and the prosecution history. The claim language at issue simply cannot support Route1's proposed meaning.

The "instruction" limitation's language requires that the controller instruct the selected host "to *establish* a connection" with the remote. ('216 Pat. at 10:19-20 (emphasis added).) On its face, that language describes a host-initiated connection. It does not encompass the opposite, a remote-initiated connection. To say otherwise would strip the word "establish" of its plain and ordinary meaning.[10] It would be illogical, absent contrary intrinsic evidence, to conclude that an instruction sent from the controller to the host somehow instructs the remote to establish the connection, when the remote has received no instruction. In short, the claim language supports construing the "instruction" limitation to allow only for host-initiated connections.

That reading is further supported by the specification, which describes only a host-initiated connection. The patent describes the "instruction" step as "[s]etting up a communication channel between a remote computer and a host computer" where the "host … sends a handshake to [the] remote[.]" ('216 Pat. 7:5-7.) Further, the patent discloses that the "remote … *receives the handshake* from [the] host[.]" ('216 Pat. 7:14-15 (emphasis added).) That handshake establishes the connection, and is initiated by the

---

[10] Black's Law Dictionary defines "establish" to mean "[t]o make or form; to bring about or into existence[.]" *Establish*, Black's Law Dictionary (11th ed. 2019).

host.  The specification teaches host-initiated connections and only such connections.  It

does not reference or otherwise disclose remote-initiated connections.[11]

Route1 argues that the specification merely describes a preferred embodiment and

that the claims should not be limited to that embodiment.  (*See* D.I. 193 at 5 ("[I]t is well

established that the claims are not limited to the disclosed embodiment absent reasons

such as prosecution disclaimer[.]").)  That argument is unpersuasive here for two reasons.

First, as discussed above, both the patent's disclosure and the claim language are

limited – by their terms – to a host-initiated connection.  *See Phillips*, 415 F.3d at 1316

("In light of the statutory directive that the inventor provide a 'full' and 'exact'

description of the claimed invention, the specification necessarily informs the proper

---

[11] As further support, Figure 3c of the '216 patent depicts the handshake with a
directional arrow confirming that the remote receives, rather that initiates, the connection.



('216 Pat., Fig. 3c (arrow from Step 335, Host: "send handshake[,]" to Step 425, Remote:
"receive handshake[,]" with no arrow in the opposite direction).)

construction of the claims."). Second, the prosecution history of the '216 patent

precludes the construction now sought by Route1.

"[T]he prosecution history can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than

it would otherwise be." *Id.* at 1317. Here, AirWatch persuasively argues that Route1's

efforts in the Patent Office to distinguish prior art, in particular the Kiwimagi reference,

confirm that the claimed method encompasses only a host-initiated connection. (*See,

e.g.*, D.I. 191 at 2-3.)

During prosecution, in response to a final rejection based on Kiwimagi, Route1

argued that Kiwimagi failed to teach certain limitations of the '216 patent. In particular,

Route1 said:

> Kiwimagi fails to show or suggest the following feature[] [of the claimed
> method]: … sending an instruction, from the controller to the selected host,
> to establish a connection to the remote. Instead, Kiwimagi teaches that the
> *remote takes the initiative to establish* a connection to the host.

(D.I. 191 Ex. 5 ('216 Pat. File History) at RT_00000344 (emphasis added).) Route1 now

contends that they only "happened to use the words 'takes the initiative to establish a

connection'" and that AirWatch's construction of the term "establish" to "carry that

additional language [of initiation] … is simply tautological … as the words 'taking the

initiative' do nothing in and of themselves to clarify how the remote and host interact[.]"

(D.I. 228 at 13.)

Contrary to Route1's attempt to evade its earlier representations, patent law does not assume that words used to traverse prior art just "happened to" be chosen. *Phillips*, 415 F.3d at 1316-17. The argument that little weight should be afforded to the words it chose to use in its statement to the patent examiner is wholly unpersuasive. *Cf. Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution …. for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (citation and internal quotation marks omitted)).

Route1 tries to redirect my attention by emphasizing a different portion of the prosecution history, which states:

> Claim 3 requires that the controller sends parameters for the remote to the host, and instructs the host to establish communication with the remote.
> *In contrast*, Kiwimagi has its security host send parameters for the host to the remote, so that the *remote can establish communication* with the host.

(D.I. 191 Ex. 5 at RT_00000343) (emphasis altered).) Route1 then argues that "the fundamental difference between the claimed invention and Kiwimagi is that in the claimed invention, the controller *brokers* the connection between the host and the remote, but in Kiwimagi the remote—which the inventor referred to as an 'unknown remote'— makes a direct connection to the host." (D.I. 193 at 4 (emphasis added) (citation omitted).) According to Route1, the "prosecution says nothing about how the host establishes a connection to the remote, nor does the prosecution state—or suggest—that the host must somehow 'initiate' a connection to the remote." (*Id.* (emphasis omitted).)

14

That is a remarkable argument, given that Route1 secured patentability by arguing that, unlike the '216 patent, "Kiwimagi teaches that the remote *takes the initiative*[.]" (D.I. 191 Ex. 5 at RT_00000344 (emphasis added).)  Contrary to Route1's assertion, the prosecution history speaks directly on this issue, distinguishing prior art based on a remote-initiated connection.[12]

Route1 cannot have it both ways.  It is improper to secure issuance of claims by arguing that they are limited to host-initiated connections, only to turn around and argue in litigation that those claims are not so limited and to assert broad infringement theories. *See Rhodia Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("[C]onsulting the prosecution history .... [e]nsures that claims are not construed one way in order to

_____

[12] Indeed, throughout prosecution, Route1 repeatedly emphasized that Kiwimagi was distinguishable because of its remote-initiated connection.  For example, during an earlier amendment, Route1 argued, "Kiwimagi teaches away from [claim 1] because [claim 1] requires that the controller instruct the host to establish a connection to the remote, whereas Kiwimagi teaches that the remote client requests a connection directly from the host system." (D.I. 205 Ex. 5 ('216 Pat. File History) at RT_00000294 (emphasis omitted).)  Similarly, it also argued: "Kiwimagi teaches away from sending parameters [to setup connection or handshake] for the remote from the controller to the selected host, as required by [claim 1,]" (*Id.* at RT_00000346,) and "Kiwimagi's remote request [sic] access from the host, so there is no need for the host to establish a connection to the remote." (*Id.* at RT_00000345.)
    Route1 contends that "[w]hat matters is what Kiwimagi actually discloses, and how that differs from the '216 Patent and the accused AirWatch products." (D.I. 228 at 13.)  Route1's attempts to highlight differences in technology between the '216 patent and Kiwimagi do not obscure its statements during prosecution, upon which the examiner relied.  *See Rhodia Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (citation and internal quotation marks omitted)).  AirWatch describes the prosecution history accurately: "actual prosecution statements belie [Route1's] revisionist history, which focused on the direction of the connection from the host to the remote device." (D.I. 253 at 7 (citing D.I. 205 Ex. 5. at RT_00000344).)

obtain their allowance and in a different way against accused infringers."). I thus

construe the "instruction" limitation to mean "sending an instruction, from the controller

to the selected host, for the host to establish a connection to the remote device." (D.I.

191 at 3.)

### 2. Infringement

An analysis of infringement involves two steps. The first step is claim

construction, "determining the meaning and scope of the patent claims asserted to be

infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995),

*aff'd*, 517 U.S. 370 (1996). "The second step is comparing the properly construed claims

to the device accused of infringing." *Id.* "Summary judgment of noninfringement is

appropriate where the patent owner's proof is deficient in meeting an essential part of the

legal standard for infringement," and "such failure ... render[s] all other facts

immaterial." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.

Cir. 2001).

To establish literal infringement, Route1 must show that the "instruction"

limitation set forth in claim 1 is found in AirWatch's accused products, exactly.[13] *See*

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("To

establish literal infringement, every limitation set forth in a claim must be found in an

---

[13] As to Step 1g, Route1 does not assert that there is infringement under the
doctrine of equivalents, only that the limitation is literally infringed. (*See* D.I. 228 at 21
(discussing the Doctrine of Equivalents argument as to different limitations (Steps 1d, 1f,
and 1h)); *see also* Oral Arg. Tr. at 26:18-27:6 (answering that the Court had not
overlooked an equivalents argument because "as [Route1] analyzed it, [it] felt like [it]
had literal[]" infringement).)

accused product, exactly."). The "instruction" limitation, as construed above, includes only host-initiated connections. Thus, there is no infringement if AirWatch's products act via a remote-initiated connection.

Route1 advances two theories of literal infringement, based on two configurations of AirWatch's products – the first being a combination of the SEG and the Exchange Server (email platform and email system), and the second a combination of the ACC and the Exchange Server (cloud component and email system). Regarding the first configuration, Route1 contends that "Dr. Akl has provided opinion and evidence that the [accused products' alleged controller] instructs the [alleged host] … to establish a connection for delivering email [(establishing a connection)] to remote devices." (D.I. 228 at 14-15 (citing D.I. 218-1 ¶¶ 127-28).) But, in the portion of the expert report Route1 cites, Dr. Akl relies on just the opposite, that "[t]he mobile device *connects to* the [SEG (the alleged host in this configuration).]" (D.I. 218-1 ¶ 127 (emphasis added).) Thus, the first configuration, acting through the SEG and Exchange Server, is a remote-initiated, not host-initiated, connection.

As to the second configuration, Route1 again relies on Dr. Akl's opinion in an attempt to carry its infringement burden. (D.I. 228 at 15 (citing D.I. 218-1 ¶ 129).) In the relevant portion of his report, however, Dr. Akl merely contends that the limitation is met because the instruction is sent to "the email system directly." (D.I. 218-1 ¶ 129.) That argument ignores his prior reliance on the fact that it is the mobile device that initiates connection. (D.I. 218-1 ¶ 127.) That the email system receives the instruction does not change that. (*See* D.I. 202-1 ¶ 217 ("[R]egardless of whether the accused instruction that

17

Dr. Akl relies on is sent to the SEG or Exchange Server, a mobile device is free [to initiate the connection.]").)

Moreover, Dr. Akl's Reply report relies on AirWatch's testimonial evidence that, in AirWatch's system, it is "not possible to make an inbound connection [(a host-initiated connection)] to a mobile device." (D.I. 218-3 ¶ 31.) In effect, that reliance amounts to a concession that AirWatch products are incapable of a host-initiated connection.[14] Consistent with that, Route1's counsel conceded at oral argument that, if AirWatch's proposed construction were adopted, Route1 could not prove literal infringement.[15] Therefore, there is no genuine dispute as to whether AirWatch's products, acting in either of the alleged configurations, infringe the "instruction" limitation. Rather, Route1 has effectively conceded that the alleged infringing products act via remote-initiated connection.

Summary judgment of non-infringement as a matter of law is thus warranted.

### 3. Validity

---

[14] It is also worth noting that Dr. Akl's Reply report was offered, in part, to respond to AirWatch's expert report, in which Alex C. Snoeren, Ph.D., opined that AirWatch's products do not practice the "instruction" limitation. But Dr. Akl did not counter or otherwise rebut AirWatch's factual contentions. Instead of grappling with Dr. Snoeren's substantive arguments, Dr. Akl merely opined that "Dr. Snoeren again attempts to narrow the plain language of the claim and asserts that an instruction to establish a connection necessarily requires the host to initiate the connection." (D.I. 218-3 ¶¶ 30-31.)

[15] (Oral Arg. Tr. at 26:19-27:6 (Judge Jordan: "If I were to construe [the "instruction" limitation as AirWatch requests], is there a way still for you to win on infringement, direct, not equivalence? [Counsel for Route1]: Not on literal infringement. … [Judge Jordan]: Because I didn't see anything, and maybe I missed it, but I didn't see any equivalence arguments. [Counsel for Route1]: No, as we analyzed it, we felt like we had literal.").)

The analytical starting point for assessing a patent's validity is the statutory presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* And carrying that burden requires proof by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).

AirWatch argues that the "instruction" limitation, and thus all claims of the patent in suit, are invalid for lack of adequate written description. (D.I. 201 at 26.) To succeed, AirWatch must show that the '216 patent's description does not "allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citation omitted) (alteration in original). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*

Route1 points to portions of the specification that it says are "sufficient to defeat a motion for summary judgment under the clear and convincing standard." (D.I. 228 at 24.) For example, it relies on the patent's recitation that:

> at step 520, controller 50 receives the parameter request message from host 60. At step 525, controller 50 checks whether any parameters have been received for this host from step 620. One of the hosts on the authorized host list will get parameters, the rest will not, since only one host-remote channel is being established. Controller 50 forwards the parameters to the selected host, and forwards a "disconnect" message to the rest of the hosts on the list.

(D.I. 218-2 (Akl Rpt.) ¶ 196 (citing '216 Pat. at 6:60-67).)

AirWatch contends that neither that excerpt, nor the patent's entire disclosure, "describes an 'instruction' to the selected host to 'establish a connection to the remote device.'" (D.I. 201 at 26-27.) "Instead, they only describe the controller sending 'parameters' concerning the remote device to the host." (*Id.*)

I conclude that Route1 wins this point at the summary judgment stage. The quoted excerpt creates at least a genuine dispute of material fact. *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014) ("Adequacy of the written description is a question of fact."). The forwarding of parameters, representing device-specific information to validate and setup the connection, in response to a "connection request message from [the] host" ('216 Pat. 6:58-59), implies that the parameters will be used to facilitate the request to connect, amounting to an instruction to connect. That, coupled with the use of the term "disconnect" implying that a connection had been formed, is a sufficient disclosure to defeat AirWatch's motion for summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, I will grant the request for additional claim construction, to the extent provided herein. (D.I. 191.) I will also grant AirWatch's motion for summary judgment of non-infringement, but deny its motion for summary judgment of invalidity. (D.I. 199.) I will deny as moot the *Daubert* motions by both parties regarding the expert opinions on damages, having held there is no infringement as a matter of law. (D.I. 197, 200.)